412 So.2d 1369 (1982)
Sam GIALLANZA, Captain Sam V. Gardner, Captain E. B. Hendrix and Warren A. Maher, Individually and as Industry Commissioners of the Crescent River Port Pilots Fee Commission
v.
LOUISIANA PUBLIC SERVICE COMMISSION and Captain Charles E. F. Arnoult, Captain E. G. Bach, III, Captain Mark Delesdernier, Jr. and Captain R. E. Ducros, Pilot Commissioners of the Crescent River Port Pilots Fee Commission, Intervenors.
Nos. 81-C-1844, 81-CA-2395.
Supreme Court of Louisiana.
April 5, 1982.
*1370 Gregory J. Avery, New Orleans, for relator.
Frederick R. Tulley and Tom F. Phillips, Taylor, Porter, Brooks & Phillips, Baton Rouge, and Edward S. Bagley, Terriberry, Carroll, Yancey & Farrell, New Orleans, for plaintiff-appellee and for respondents.
Marshall B. Brinkley, Baton Rouge, for defendant-appellee and respondents.
Joseph W. Nelkin, New Orleans, for intervenors-appellant and for relator.
DENNIS, Justice.
This is a river port pilot rate case. The questions presented are: (1) whether the Public Service Commission, in the absence of an agreement between the pilots and the steamship industry, may exercise its regulatory authority in fixing pilotage fees; (2) *1371 whether the Public Service Commission's order sets forth findings of fact and a statement of reasons from which a court can determine that there is a reasonable basis for the pilotage fees fixed.
In June, 1979 the Louisiana Public Service Commission was called upon by the industry and pilot commissioners of the Crescent River Port Pilot Fee Commission to revise rates and charges for services rendered by the river port pilots. After conducting hearings and receiving evidence, the Public Service Commission issued an order on August 4, 1980 by which it: (1) determined that twenty additional river port pilots are necessary to adequately serve shipping in the Mississippi River, the Mississippi River Gulf outlet and the Port of New Orleans; (2) ordered the Crescent River Port Pilots Association to expeditiously commission twenty additional river port pilots; and (3) adopted a new schedule setting fees for the services rendered by the river port pilots.
Dissatisfied with this result the industry commissioners of the Crescent River Port Pilots Fee Commission petitioned the Nineteenth Judicial District Court to reverse and set aside the Public Service Commission's order.[1] The pilot commissioners intervened seeking an amendment of the order to increase the fees allowed and the number of new pilots to be added.
The district court interpreted the Public Service Commission order to mean that twenty new pilots are authorized and mandated and that the additional funds realized from the new fee schedule are to be used to pay each pilot the same amount a pilot was making before the order. The court approved the Commission's finding that twenty additional pilots are necessary to adequately serve the area between Pilottown and New Orleans. However, the court modified the effective date of the new fees in order to prevent a windfall to the veteran pilots. It provided that only one-twentieth of the new rate shall become effective upon the commissioning of each new pilot. Also, it found that the Commission's order arbitrarily allowed the pilots double compensation for boat service and reduced this amount accordingly.
The pilot commissioners of the Crescent River Port Pilots Fee Commission appealed to this court from the district court decision. The commissioners also applied for a writ of certiorari, which we granted and consolidated with the appeal.

The Role of the Public Service Commission in Pilot Fee Regulation
The Governor is authorized to appoint and commission river port pilots certified as qualified by the Board of River Port Pilot Commissioners for the Port of New Orleans. La.R.S. 34:992, 993. Commissioned river port pilots have the exclusive right to pilot vessels between Pilottown and New Orleans, within the Port of New Orleans, and on other inland waterway routes connecting with the port. La.R.S. 34:996. The pilots are authorized to organize by forming a river port pilots association. La.R.S. 34:995. See Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1946); Brechtel v. Board of Examiners of Bar Pilots, 230 F.Supp. 18 (E.D.La.1964); Hendrix v. Louisiana Public Service Commission, 262 La. 420, 263 So.2d 343 (La.1972); A. Parks, The Law of Tug, Tow and Pilotage, 513-519 (1971).
Originally, pilots' fees were regulated directly by statute. La.R.S. 34:997-999. In 1968, however, the legislature established pilot fee commissions composed of four members of the pilots' association and four members of the steamship industry. La. R.S. 34:1121. The pilot fee commissions have authority to fix "reasonable and just... fees for pilotage services to ships and vessels, giving due regard to the length, draft and tonnage of the vessels ..., the difficulty and inconvenience of the particular service and the skill required to render it, the supply of and demand for pilotage *1372 services, the public interest in maintaining efficient, economical and reliable pilotage service and other factors relevant to the determination of reasonable and just rates...." La.R.S. 34:1122.
In the event that the pilot and industry commissioners are unable to resolve any dispute as to pilotage rates or any other legitimate business, the question may be referred to the Louisiana Public Service Commission by commissioners representing either pilots or industry. La.R.S. 34:1121. If the question of reasonable and just pilotage fees or any other matter is so referred, the decision of the Public Service Commission shall constitute the decision of the pilotage commission. Id.
Under this court's previous interpretation of this statutory scheme, the Public Service Commission's regulatory authority is invoked when the question of reasonable and just pilot fees or other matters are referred to it. Hendrix v. Louisiana Public Service Commission, 262 La. 420, 263 So.2d 343 (1972). Accordingly, in a case appealed directly from the district court, we held that pilot fees fixed by the Public Service Commission in default of an agreement by a majority of the pilot fee commission should be affirmed by the courts unless they are found to be arbitrary, capricious, or without support by evidence in the record. Id. 263 So.2d at 350.
The industry commissioners challenge our construction of the legislative aim. They argue that the statute only empowers the Public Service Commission to act as a tiebreaker in the event that a majority of the pilot fee commission is unable to agree upon rates. Accordingly, they contend that the Public Service Commission is not authorized to regulate pilot fees but must restrict itself to voting yes or no on fee schedules or other questions referred. Consequently, they urge, judicial review of the Public Service Commission's decision in this capacity is not governed by the constitutional and statutory rules applicable to review of its actions as a regulatory authority.
In support of their arguments, the industry commissioners point to statutory provisions requiring the Public Service Commission to "serve as a member of each pilot fee commission in the event that the pilot and industry commissioners are unable to resolve any dispute as to pilotage rates," La. R.S. 34:1121, and authorizing suits before "courts of competent jurisdiction" to contest the validity of any decision of the pilot fee commission. La.R.S. 34:1127. They contend these provisions indicate a legislative design under which the Public Service Commission acts as one member of the pilot fee commission and the fees fixed by the pilot fee commission are amenable to review by general judicial procedures.
Reexamination of the statute, however, convinces us that our original conclusion in Hendrix v. Louisiana Public Service Commission, supra, was correct. The legislative aim was to provide the Public Service Commission with additional regulatory authority and not merely to make it the functionary of a statutory board. The statute emphatically dictates that, if a question is referred to it, "[t]he decision of the Public Service Commission shall constitute the decision of the pilotage commission." La.R.S. 34:1121. The Public Service Commission is authorized to decide any "legitimate business of the [pilot fee] commission" referred to it, La.R.S. 34:1121, which may include the fixing of "reasonable and just pilotage fees." La.R.S. 34:1122. Its charter does not restrict it to voting yea or nay upon the fee schedules which may be submitted to it by one interest group or another represented on the pilot fee commission. To so hobble the Commission would prevent it from using its own expertise and exercising its independent judgment as to just and reasonable rates charged for an important public service. That the legislative aim was to relegate the Commission to such a minor role in a vital area of public service regulation is unlikely in view of its position as a constitutional regulatory authority and its historic dominance of rate-making in Louisiana.
Furthermore, if the statute did not delegate regulatory authority to the Public Service Commission or call upon the courts to *1373 review its actions as a ratemaking body, several bizarre results would follow. An attempt by the Commission to adopt a rate schedule different from that upon which the industry and pilot commissioners had reached a tie vote would result in a failure of the pilot fee commission to take any action which could be reviewed. The courts would be forced to dismiss or remand any case appealed in which the Commission failed to cast a simple yes or no, tie-breaker vote. In any case, the administrative record made before the Public Service Commission could have little significance on judicial review since it could support only one out of nine votes on the pilot fee commission. We do not understand even the industry commissioners to argue for these strange consequences. They wish to have the case fall outside the Public Service Commission's jurisdiction in order to avoid a direct review of the district court's judgment by this court, but they either overlook or ignore the many other implications of their argument.
Article 4, § 21(B) of the 1974 Louisiana Constitution provides that the Public Service Commission shall regulate common carriers and public utilities "and have such other regulatory authority as provided by law." For the reasons assigned, we conclude that the statutory scheme under consideration, La.R.S. 34:1121-1127, provides "other regulatory authority" to the Public Service Commission in cases in which the regular members of a pilot fee commission are unable to agree upon reasonable and just pilotage fees or any other legitimate business of the pilot fee commission. In essence, the statute provides that, in the absence of bargained pilot fees, the Public Service Commission shall regulate rates. Accordingly, appeals from actions by the Public Service Commission in regulating pilot fees are governed by Article 4, § 21(E) of the constitution, which provides that an appeal may be taken from any action by the Commission to the district court in its domicile and that a direct appeal from any judgment of the district court shall be allowed to the supreme court.
Our conclusions are consistent with the judicial review section of the pilot fee commission statute. La.R.S. 34:1127 provides that "[p]roceedings may be brought before courts of competent jurisdiction under state law for the purpose of contesting the validity of any decision of the [pilot fee] commission hereunder." This section provides a rule of judicial review for a case in which the pilot fee commission decides a question by a majority vote without referring it to the Public Service Commission. Since the Public Service Commission is not empowered to serve as a member of the pilot fee commission merely for the purpose of casting its vote, but is authorized to exercise its own regulatory authority to fix rates in cases referred to it, appeals from its actions in regulating pilot fees are not governed by La.R.S. 34:1127 but by Article 4, § 21(E) of the constitution.

Judicial Review of the Public Service Commission's Rate Order
In regulating fees for the public service of river pilotage it is evident that the Public Service Commission necessarily must follow a procedure similar to that which it employs in regulating the rates of a public utility. The Public Service Commission, when acting in place of the pilot fee commission, is charged with the responsibility of fixing and establishing "reasonable and just pilotage fees." La.R.S. 34:1122. The primary purpose of its rate making process is to set pilotage fees at such a level that the pilots' revenues will be sufficient to permit them to both pay their legitimate operating expenses and to provide them compensation for their services and investment adequate to maintain efficient, economical and reliable pilotage service, giving due regard to the length, draft and tonnage of the vessels to be piloted, the difficulty and inconvenience of the particular service and the skill required to render it, the supply and demand for pilotage services, and other factors relevant to reasonable and just ratemaking. La.R.S. 34:1122; see A. Parks, Law of Tug, Tow and Pilotage, 516-519 (1975). When this level is achieved the pilots' revenues may be said to produce a *1374 fair rate of return, and rates which produce such a return are reasonable and just. Cf. So. Cent. Bell Tel. v. La. Public Service Comm'n, 352 So.2d 964 (La.1977); Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L.Rev. 873 (1974); J. Bonbright, Principles of Public Utility Rates, 147-283 (1961); 1 A. Priest, Principles of Public Utility Regulation, 45-226 (1969).
In reviewing this rate making process the inquiry of the judiciary is generally confined to a determination of whether the Public Service Commission acted unreasonably or arbitrarily in establishing fees for pilotage services. Hendrix v. Louisiana Public Service Commission, supra; cf. So. Cent. Bell Tel. Co. v. Louisiana Public Service Commission, supra; Priest, supra at 436. As the United States Supreme Court, in assessing the Federal Power Commission's performance of its statutory duty to fix "just and reasonable" rates, observed:
"If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. * * *" Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); So. Cent. Bell Tel. v. La. Public Service Com'n, 352 So.2d at 968.
Nevertheless, for purposes of judicial review, and in order to assure that the Commission has acted reasonably and in accordance with law, in a contested case involving complex issues, the agency is required to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings; and it must articulate a rational connection between the facts found and the rates fixed. Baton Rouge Waterworks v. Louisiana Public Service Commission, 342 So.2d 609 (La. 1977); cf. Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); Capital Transit Co. v. Public Utilities Commission, 213 F.2d 176, 187 (D.C.Cir.1954) (separate opinion by Stephens, C. J.), cert. denied 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 643 (1954); 3 K. Davis, Administrative Law Treatise, 124, 130 (2d ed. 1978). For instance, a rate order establishing a pilot fee schedule should include findings supported by evidence of basic facts such as the pilots' total revenues, expenses and investments during the test year; the pilots' average annual earnings during the test year; the pilots' estimated revenues, expenses, investments and average earnings for future years; the pilots' work schedules and working conditions; the supply and demand for pilotage services; and any other basic facts affecting the maintenance of efficient, economical and reliable pilotage service. The order should include findings of ultimate facts, flowing from the basic findings, as to the fair average annual compensation for a pilot operating under similar working conditions and the rates necessary to produce such a return after subtracting legitimate expenses and a fair return on any capital investment of the pilots. Finally, the order should articulate reasons showing that there is a rational relationship between the rates fixed, the ultimate facts inferred, and the basic facts found and supported by evidence. A statement of reasons must be adequate to enable the court to determine whether the agency's decision was reached for an impermissible reason or for no reason at all. For this essential purpose, although detailed findings of fact are not required, the statement of reasons should inform the court and the complaining party of both the grounds of decision and the essential facts upon which the agency's inferences are based. Cf., Dunlop v. Bachowski, 421 U.S. 560, 571-572, 95 S.Ct. 1851, 1859-60, 44 L.Ed.2d 377 (1975); K. Davis, supra, p. 125.
*1375 In cases presenting only simple issues for judicial review, where the findings and reasons for the Commission's action are necessarily implied by the record, and where our study of a brief administrative record readily yields sufficient evidence to support the administrative determination, we have refused to remand for the formality of having the agency make explicit its finding which was already self evident. Baton Rouge Waterworks v. Louisiana Public Service Commission, supra; see Central Louisiana Electric Co., Inc. v. Louisiana Public Service Commission, 370 So.2d 497 (La.1979). We will remand for the purpose of having the Commission make findings and state reasons, however, when we are unable to review the agency determination without them. As the United States Supreme Court has said, "while we may not supply a reasoned basis for the agency's action that the agency has not given ... we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transportation Inc. v. Arkansas-Best Freight, Inc., supra, 419 U.S. 281, 285-86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); See 3 K. Davis, Administrative Law Treatise, p. 130.
The Public Service Commission's rate order merely sets forth its conclusions as to the increased rates which should be charged and the number of new pilots which should be commissioned. It does not contain any finding as to revenues, expenses or average annual earnings of pilots.[2] Nor does it include any statement of reasons. The commission's schedule of fees suggests that it did not accept the findings of basic facts urged by either party. The pilot commissioners presented evidence which tended to support larger increases in pilot fees and more additional pilots, whereas the industry commissioners' evidence could have provided a basis for a reduction in pilotage fees.[3] The Commission must *1376 have made different basic findings than those urged by the parties, or else it must have drawn different inferences for different reasons from the basic facts.
This is not a simple case in which the findings and reasons for the Commission's action are necessarily implied by the record. The Public Service Commission's schedule of pilot fees sets forth over 60 different charges for pilotage, docking or undocking, shifting, trial trip, compass adjusting and calibrating R.D.F., detention and discharge, and transportation.[4] Without findings of fact by the agency as to the frequency of each charge during the test year we are unable to determine the gross revenues which the fees are expected to yield. Without findings of fact as to the expenses and investment necessary to perform the services for which the fees are imposed we cannot calculate the net annual return to the pilots. In the absence of these basic findings and further ultimate findings and reasons, we cannot tell whether the Public Service Commission's apparent conclusion that the fee schedule will produce a return which is adequate, and not deficient or excessive, is reasonable.
The industry commissioners, in an effort to carry their heavy burden of making a convincing showing that the Public Service Commission's rate order is unjust and unreasonable in its consequences, present two arguments: That the pilot fee schedule is patently excessive as shown by the evidence proffered in the district court that one pilot had annual earnings in excess of $110,000 under the old fee schedule; and that the fee schedule is based upon a double reimbursement of boat expenses to the pilots.[5] While the industry commissioners have not at this time persuaded us that the Commission's fee schedule is unjust and unreasonable in its consequences, we are persuaded that in *1377 order to obtain the judicial review to which the industry commissioners are entitled, the Commission must provide some additional reasons for the agency decision. See Camp v. Pitts, 411 U.S. 138, 139, 93 S.Ct. 1241, 1242, 36 L.Ed.2d 106 (1973); Maine v. Kreps, 563 F.2d 1043 (1st Cir. 1977).

Decree
We conclude that the administrative record is inadequate for this court to decide either way on whether the Public Service Commission's action was arbitrary, capricious or without support by evidence in the record. Nevertheless, because the circumstances of this case require continued effectiveness of the rate order and expeditious termination of the litigation, we will not remand the case but instead order the Public Service Commission to file in this court within thirty days a statement of the grounds of its decision and the essential facts upon which its inferences are based. Cf. Maine v. Kreps, 563 F.2d 1043 (1st Cir. 1977).
PUBLIC SERVICE COMMISSION ORDERED TO FILE FINDINGS AND REASONS.

 APPENDIX
 ========
 FOOTNOTE NO. 4
 PILOTAGE
Pilotage between Pilottown and
 New Orleans or Light 98 on the
 Mississippi River Gulf Outlet and
 New Orleans and all Intermediate
 Points, or vice versa, per foot
 deepest Freshwater draft................... $ 10.50
Minimum Pilotage (15 feet)................... 158.50
From Pilottown to Quarantine
 Anchorage, or between Quarantine
 Anchorage and Pilottown,
 Weather delays and/or
 Government regulations excluded:
 1) Vessels requiring up to
 9 hours-regular pilotage
 fee.
 PILOTAGE
 2) Vessels requiring in excess
 of 9 hours but less than
 12 hours-regular pilotage
 fee plus one-half pilotage
 fee, the one-half pilotage
 not to exceed the $140.25
 minimum.
 3) Vessels requiring in excess
 of 12 hours-two pilotage
 fees.
Pilotage service shall be considered
 completed when a Vessel
 arrives at the point without
 orders.
 TONNAGE
Greater deadweight Tonnage for
 vessels of at least 21,000 DWT............. $ 34.00
Each 1,000 DWT in excess of
 21,000 DWT, to at least 60,000
 DWT, increments of......................... 4.15
Each 1,000 DWT in excess of 60,000
 DWT, increments of ....................... 5.00
 DISTANCE CHARGE
Each vessel piloted 80 miles or
 more, a distance surcharge based
 on the greater deadweight tonnage
 listed in Lloyd's Register.
 (a) Vessels under 21,000 deadweight
 tons ................................ $ 65.00
 (b) Vessels 21,000 deadweight
 tons to 60,000 deadweight
 tons ................................ 165.00
 (c) Vessels over 60,000 deadweight
 tons ................................ 265.00
 DOCKING OR UNDOCKING
Docking and undocking vessels an
 additional fee based on the
 vessel's overall length listed in
 Lloyd's Register, as follows:
 Under 300 feet .......................... $ 14.50
 300 feet and under 600 feet ............. 30.00
 600 feet and over........................ 40.00
Vessels shall not be charged docking
 and undocking fees whenever
 a shifting fee is earned.

*1378
Docking vessels, head-down, an
 additional................................. $ 36.25
Undocking vessels from a headdown
 position, an additional ................... 36.25
Docking vessels stern first in
 Chalmette slip, an additional ............. 36.25
 SHIFTING
 1 Shifting from within the Industrial
 Canal between River
 side of Florida Avenue
 Bridge to the Locks on
 ships going to Sea ..................... $ 75.00
 2 Shifting within the Industrial
 Canal between Locks and
 Florida Avenue Bridge .................. 75.00
 3 Shifting within the Industrial
 Canal between Lake side
 of Florida Avenue Bridge
 to Lake Pontchartrain, or
 vice-versa.............................. 75.00
 4 Shifting from Industrial Canal
 Locks to beyond Florida
 Avenue Bridge, or vicoversa............. 95.00
 5 Shifting from Quarantine Anchorage,
 General Anchorage,
 or City Front, into
 Industrial Canal, not beyond
 River side of Florida
 Avenue Bridge, or viceversa ............ 127.00
 6 Shifting from Quarantine Anchorage,
 General Anchorage,
 or City Docks to
 beyond Florida Avenue
 Bridge, or vice-versa .................. 140.00
 7 From within the Industrial
 Canal to Michoud, either direction...... 95.00
 8 Harvey Canal Bridge to any
 wharf in Canal, back to
 Hero's Cut, or vice-versa ............. 75.00
 9 Algiers extension to Hero's
 Cut, or vice-versa...................... 75.00
10 Shifting within the Harvey
 Canal, or Algiers extension
 Area, either direction ................ 75.00
11 Quarantine Anchorage, General
 Anchorage, or City
 Front into Harvey Canal,
 or vice-versa .......................... 118.00
12 Quarantine Anchorage, General
 Anchorage, or City
 Front, to Harvey Canal,
 River side of Hero's Cut,
 via Algiers extension, or
 vice-versa ............................. 140.00
13 Shifting from Anchorages, off
 of docks, below Meraux,
 to and including Poverty
 Point, or vice-versa ................... 95.00
14 Shifting from Anchorage, off
 of docks, below Poverty
 Point to and including Venice,
 or vice-versa .......................... 115.00
15 Miscellaneous Fees,
 All shifts within the HABOR
 OF NEW ORLEANS
 (Southport to Meraux) ................. 92.00
Dead Ships to be charged a double
shifting fee.
 TRIAL TRIP, COMPASS AJUSTING
 AND CALIBRAING
 R.D.F.
16 Trial trip, within harbor, time
 limit three (3) hours .................. $ 88.50
 Thereafter, per hour ................... 15.50
17 Trial trip, outside harbor, and
 return to New Orleans each
 way. Minimum ........................... 161.50
18 Calibrating R D F ........................ 75.00
19 Compass Adjusting ........................ 75.00
20 Calibrating Radio Direction
 Finder and Compass adjusting,
 in sequence ............................ 110.50
21 For return of vessel to any
 wharf after calibrating Radio
 Direction Finder, or
 Compass adjusting, or both,
 regular shifting fee shall
 apply.
22 For Vessels departing from
 any City Front Wharf,
 with orders to anchor at
 Quarantine Anchorage or
 General Anchorage, after
 Radio Direction Finder or
 Compass adjusting, a regular
 shifting fee from point
 of departure shall apply.
 DETENTION AND DISCHARGE
23 In the event a pilot is detained
 more than one hour

*1379
 for any cause except weather
 or awaiting berths, a detention
 charge shall apply
 and be paid per hour, or
 fraction thereof, including
 payment for the first hour
 up to and including the
 fourth hour ............................ $ 15.50
24 In the event a pilot is detained
 more than four hours
 for any cause except weather
 or awaiting berth, the
 detention charge for each
 hour, or fraction thereof,
 after the fourth hour shall
 be ..................................... 34.50
25 Discharge from within the
 Port of New Orleans .................... 30.75
26 Discharge from without the
 Port of New Orleans .................... 43.00
27 Whenever a vessel has to
 stand by or anchor more
 than 20 minutes off berth
 because berth is occupied,
 detention shall be charged
 for each hour or fraction
 thereof, from arrival off
 berth .................................. 15.50
28 If delayed beyond two hours
 the prescribed shifting fee
 shall be charged in lieu of
 detention, for each hour, or
 fraction thereof, beyond the
 third hour, detention charge 15.50
29 For each hour, or fraction
 thereof, beyond the fourth
 hour, detention charge ................. 34.50
 TRANSPORTATION
For proceeding to and from:
INDUSTRIAL CANAL:
 30 Turning Basin, including
 Galvez St., Florida Ave.
 and Cement Plant
 Wharves .............................. $ 9.50
 31 Pendleton, Delta and Higgins............ 9.50
 32 Seabrook ............................... 12.00
 33 Michoud................................. 13.80
DOWN RIVER:
 East Bank:
 34 Chalmette Slips......................... $ 9.50
 35 Standard Oil, Meraux, Tenneco .......... 9.50
 36 Braithwaite ............................ 22.00
 37 Port Nickel............................. 26.50
 38 Davant.................................. 43.75
 West Bank:
 39 Navy Ammunition Dump,
 Yeast Plant, Seatrain and
 Concord Explosive Anchorage,
 Oak Point, Oakville................... 27.50
 40 Myrtle Grove, Alliance ................. 35.75
 41 Port Sulphur ........................... 39.75
 42 Ostrica ................................ 43.75
 43 Venice ................................. 58.00
UP RIVER:
 East Bank:
 44 Southport............................... 12.00
 West Bank:
 45 Harvey River Front Docks ............... 12.00
 46 Harvey Canal ........................... 12.00
 47 Algiers Canal .......................... 12.75
 48 Marrero, Perry Street, Gulf
 Gretna, S. P. Gretna ................. 12.00
 49 Westwego ............................... 16.00
 Rates to apply to Transportation
 for Pilots either to or
 from the above points.
 50 Whenever it is necessary
 for a Pilot to use Boat
 Service, to board or leave
 a vessel, the cost thereof
 shall be paid by the vessel.

When pilot services are timely offered and refused, said vessel shall pay such charge. These pilotage charges shall bear as a lien upon the vessel subject thereto.
Said river port pilots shall also be entitled to enter into agreements with the masters or owners of ships and vessels for special services and the hire of boats and equipments, and the like, at such rates for such sums as may be agreed between them.
Vessels of one hundred tons or under, lawfully engaged in coastwise trade of the United States shall not be required to take a pilot, unless the master of such vessel demands pilot service.
NOTES
[1] Pending the appeal, the difference between the pilotage rates before the order and the rates in effect after the order have been deposited in an escrow account established by the district court. Giallanza v. Louisiana Public Service Commission, 389 So.2d 1127 (La.1980).
[2] The district court concluded that the Public Service Commission found that the pilots should earn $85,047.00. We are unable to understand upon what basis the district court made this conclusion. The record is devoid of any statement by the Commission that the pilots should earn this amount. Moreover, we are unable to determine from the voluminous record that the Commission necessarily made such a finding.
[3] The parties stipulated that, if called to testify in the district court proceeding, Louis S. Quinn, Executive Secretary of the Louisiana Public Service Commission, would testify in accordance with his affidavit and attached documents which were filed into the record. From Mr. Quinn's affidavit and attached document we gather that the commission found the following facts: On June 7, 1979 the industry commissioners petitioned the Louisiana Public Service Commission to enter into proceedings to resolve an issue between themselves and the pilot commissioners. The industry commissioners in their petition claimed that the Crescent River Port Pilots' average earnings for 1979 was $80,272.00 per pilot. They contend this is well above the $66,463.00 per pilot figure awarded by the Nineteenth Judicial District Court in a previous case. The industry commissioners proposed to eliminate the surcharge on vessels piloted 80 miles or more. The industry commissioners also contended that even without the surcharge the pilots would average $71,712.00 annually.

The pilot members of the fee commission responded by filing their own certification requesting an increase in pilotage rates and the number of pilots to be funded. The pilots requested an increase in pilotage charges over a two year period, 1980 and 1981. For the year 1980 the pilots requested an increase in annual gross revenues of $2,148,100.00. This amount was to be generated by:

a) Increasing draft charges by 18.7%
 amounting to $ 969,785
b) Increasing tonnage charges by
 1.1.2% amounting to 354,796
c) Increasing docking and undocking
 charges by 29.8% amounting
 to 41,336
d) Increasing harbor moves charges
 by 20.8% amounting to 41,415
e) Increasing transportation charges
 by 20.8% amounting to 31,788
f) Increasing distance charges by
 52.3% amounting to 694,897
 The proposed increase in distance
 charges is to fund 7 new
 pilots
g) Increasing other charges by
 20.8% amounting to 14,083
 ___________
 Total requested increase for year
 1980 $ 2,148,100

The pilots projected, with the increased annual growth revenues of $2,148,100, the net distributable income to pilots would be $1,906,540.00. This net distributable income of $1,906,540.00 added to the net distributable income for the test year of $6,917,162.00 would result in a net distributable income for prospective year 1980 of $8,823,702.00. If no pilots were added, the present 82 pilots would average $107,606.00. With the addition of seven new pilots, as proposed by the pilot commissioners, in 1980 the total number of pilots would be 89, with an average income for each pilot of $99,143.00. Average income per pilot for the test year September 1, 1978 through August 31, 1979 was $85,047.00. The $99,143.00 projected average income per pilot for year 1980 reflects a 16.6% increase over the test year figure. For the year 1981 the pilots requested an increase in annual gross revenues of $1,442,792.00 over prospective year 1980. They propose that this amount be generated by:

a) Trended increase in draft charges
 over prospective year 1980 of 85,448
b) Trended increase in tonnage
 charges over prospective year
 1980 of 163,054
c) Trended decrease in docking and
 undocking charges under prospective
 year 1980 of (17,763)
d) Trended decrease in harbor
 moves charges under prospective
 year 1980 of (12,047)
e) Increasing distance charges by
 60.9% over prospective year
 1980 changes amounting to 1,224,100
 The proposed increase in distance
 charges Is to fund an
 additional 28 new pilots. ___________
 Total requested increase
 for year 1981 over
 prospective year 1980 $1,442,792

The pilots projected, with the increased gross annual revenues of $1,442,792 the net distributable income to the pilots would be $1,289,034.00.
The distributable income of $1,289,034.00 added to the net distributable income of the prospective year 1980 of $8,823,702.00 results in a new distributable income for prospective year 1981 of $10,112,736.00. With the addition of 28 new pilots in 1981, as proposed by the pilots' commissioners, the total number of pilots would be 117, with an average income for each pilot of $86,434.00. Average income per pilot for the test year September 1, 1978 through August 31, 1979 was $85,047.00. The $86,434.00 projected average income per pilot for year 1981 reflects a 1.6% increase over the test year figure.
[4] See appendix.
[5] The other arguments raised by the industry commissioners are clearly without merit. The Public Service Commission has the authority to establish any pilotage fees, including new categories of charges, as long as they are reasonable, and just, and otherwise in accordance with La.R.S. 34:1122. Although the Public Service Commission may not order the Governor to commission new pilots, it may fix rates contingent upon the creation of new pilot positions if they are necessary, and we construe the rate order in this case as expressing such an intention.

The pilot commissioners' contentions that the district court erred in modifying the Public Service Commission's order may have merit. However, an evaluation of these arguments should await the filing of the findings and reasons of the Public Service Commission.