943 So.2d 1169 (2006)
In re: ARK-LA-TEX ANTIQUE AND CLASSIC VEHICLES, INC. and Ark-La-Tex Antique and Classic Vehicles Enterprises, L.L.C.
No. 2005 CA 1931.
Court of Appeal of Louisiana, First Circuit.
September 15, 2006.
*1171 Billy R. Pesnell, Shreveport, Counsel for Applicants Ark-La-Tex Antique and Classic Vehicles, Inc. and Ark-La-Tex Antiques and Classic Vehicles Enterprises, L.L.C.
R. Gray Sexton, Kathleen M. Allen, Baton Rouge, Counsel for Respondent Louisiana Board of Ethics.
Before: KUHN, GAIDRY, and WELCH, JJ.
KUHN, J.
Ark-La-Tex Antique and Classic Vehicles, Inc. (the Museum) and Ark-La-Tex Antiques and Classic Vehicles Enterprises, L.L.C. (Enterprises), appeal the decision of the Louisiana Board of Ethics (the Board), which concluded that each had violated provisions of the Code of Governmental Ethics, for which civil penalties were imposed. We affirm.

I. FACTS AND PROCEDURAL BACKGROUND
Roy H. Miller has been employed as the Director of Airports for the City of Shreveport since 1989. The City of Shreveport and the Shreveport Airport Authority entered into a lease, effective October 23, 2000, with the Shreveport Golf Company, which planned to construct a golf course on airport property. Shreveport Golf Company is a Texas general partnership consisting of two general partners: Golf Management Company of Louisiana, L.L.C., represented on the lease by FFFC Golf Acquisitions, L.L.C., which is the sole member of Golf Management Company of Louisiana; and HCS-Golf Course, L.L.C., represented on the lease by Hollywood Casino Shreveport, a Louisiana general partnership and the sole member of HCS-Golf Course, L.L.C., which in *1172 turn appeared through HCS I, Inc., the managing general partner of Hollywood Casino Shreveport (Hollywood Casino).
Roy Miller was married to Francene Miller, who was the sole incorporator of the Museum, a nonprofit corporation that operates a car museum. Mrs. Miller acquired an historic building in downtown Shreveport and rented a portion of it to the Museum. The Museum generates income through a gift shop, donations, special events, admission fees, grants, and the hotel-motel tax. Mrs. Miller subsequently formed Enterprises as a limited liability company to provide her with personal financial protection. Enterprises consists of two members: Mr. and Mrs. Miller. Mrs. Miller transferred to Enterprises the ownership of the building housing the Museum, and the Museum, thus, became obligated to pay rent to Enterprises. In 1995, Enterprises became obligated to pay a monthly note on a mortgage that secured the property. It is undisputed that the Museum did not make sufficient revenue to regularly pay its monthly rental obligation to Enterprises and that Mr. and Mrs. Miller paid the mortgage note from their monthly savings when Enterprises did not have sufficient funds.
On March 1, 2001, Hollywood Casino entered into a five-year lease with Enterprises for space to operate a parking garage in the basement of the building housing the Museum for the monthly sum of $4,000. And on August 15, 2001, Hollywood Casino paid the Museum an additional $2,250 to rent space at the museum to hold a three-day gin rummy tournament.
Based on complaints levied by George H. Mills, an attorney representing a client who had dealings with the airport, an investigation was conducted by the Board. Formal charges were then filed against Mr. Miller, the Museum, and Enterprises.
After testimony and documentary evidence were adduced at a public hearing, the Board concluded that both the Museum and Enterprises had violated the provisions of the Code of Governmental Ethics ("the Code"), La. R.S. 42:1101-1170 and imposed civil penalties. This appeal by the Museum and Enterprises follows.

II. DUE PROCESS
Appellants initially allege a violation of their due process rights. They urge that the record reflects that the Board failed to consider the draft opinion they submitted. On our motion, we ordered a supplementation of the record,[1] including the transcript of the public hearing held on June 2, 2005, and the exhibits under consideration.
At the hearing, the Board addressed the proposed opinions submitted by the appellants and Mr. Miller as well as one drafted by a Board representative with no connection to either the investigation or prosecution of the case. At the conclusion, the Board adopted several non-substantive modifications of the draft prepared by its representative.[2] Based on our review of the record, particularly those items transmitted *1173 pursuant to our order of supplementation of the record, appellants err in suggesting that the Board excluded consideration of their proposed drafts of opinions. We find no merit in appellants' contention that the approach undertaken by the Board was biased and in derogation of their due process rights.

III. JUDICIAL REVIEW

A. Standard of Review
Pursuant to La. R.S. 42:1143, all proceedings conducted by the Board shall be subject to and in accordance with the Louisiana Administrative Procedure Act, La. R.S. 49:950-972. Thus, judicial review of the Board's decision is available to appellants. The Administrative Procedure Act specifies that judicial review shall be confined to the record, as developed in the administrative proceedings. La. R.S. 49:964(F). The reviewing court may reverse or modify the agency decision if substantial rights of the appellant are prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary, capricious, or an abuse of discretion; or (6) not supported and sustainable by a preponderance of evidence as determined by the reviewing court. La. R.S. 49:964(G). On legal issues, the reviewing court gives no special weight to the findings of the administrative tribunal, but conducts a de novo review of questions of law and renders judgment on the record. In re McJunkins, 99-0326, p. 5 (La.App. 1st Cir.3/31/00), 794 So.2d 845, 848.

B. Violations of the Code
La. R.S. 42:1111(C)(2), pertaining to payments for nonpublic service, provides in pertinent part:
(2) No public servant and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, shall receive any thing of economic value for or in consideration of services rendered, or to be rendered, to or for any person during his public service unless such services are: . . .
(d) Neither performed for nor compensated by any person from whom such public servant would be prohibited by R.S. 42:1115(A)(1) . . . from receiving a gift.
La. R.S. 42:1115, pertaining to gifts, provides in pertinent part:
A. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
(1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency. . . .
The Board determined that the Museum had violated Sections 1111(C)(2)(d) and 1115 by its receipt of $2,250 from Hollywood Casino-Shreveport for the lease of space for the gin rummy tournament at a time when Hollywood Casino-Shreveport was a party to or had an interest in the development of a golf course with the City of Shreveport and the Shreveport Airport Authority and while Mr. Miller served as the Shreveport Airport Director and exercised control over the Museum. A civil penalty of $2,250 was imposed against the Museum. Insofar as Enterprises, the Board concluded that it violated Sections *1174 1111(C)(2)(d) and 1115 of the Code by the company's receipt of $4,000 a month, commencing in April 2001, from Hollywood Casino-Shreveport for the lease of the parking garage at a time when Hollywood Casino-Shreveport was a party to or had an interest in the development of the golf course and while Mr. Miller was employed as the City of Shreveport's Airport Director and owned more that 25% of or exercised control over Enterprises. A civil penalty of $5,000 was imposed against Enterprises.

B. Propriety of the Board's Factual Conclusions
Urging that it is "impossible to discern the basis of the Board's decision" on its findings that Mr. Miller "exercised control" over the Museum or that he "owned more than 25% of and/or exercised control over" Enterprises, appellants assert that the Board has failed to accompany these findings of fact with a concise and explicit statement of the underlying facts as required by La. R.S. 49:958.
La. R.S. 49:958 provides:
A final decision or order adverse to a party in an adjudication proceeding shall be in writing or stated in the record. A final decision shall include findings of fact and conclusions of law. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings. If, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling upon each proposed finding. Parties shall be notified either personally or by mail of any decision or order. Upon request, a copy of the decision or order shall be delivered or mailed forthwith to each party and to his attorney of record. The parties by written stipulation may waive, and the agency in the event there is no contest may eliminate, compliance with this Section.
While the Board must articulate the basis for its decision, where the findings and reasons therefor are necessarily implicit in the record and the administrative determination is supported and sustainable by a preponderance of the evidence, the administrative decision is not invalid merely because the Board failed to explicitly articulate that which is self evident. Summers v. Sutton, 428 So.2d 1121, 1128 (La.App. 1st Cir.1983) (relying on Baton Rouge Water Works v. La. Pub. Serv. Comm'n, 342 So.2d 609 (La.1977); Brown v. Sutton, 356 So.2d 965 (La.1978); Giallanza v. Louisiana Pub. Serv. Comm'n, 412 So.2d 1369 (La.1982)).
By failing to expressly state the factual findings in support of its conclusions that Mr. Miller exercised control over the Museum or that he owned more than 25% of or exercised control over Enterprises, the Board's decision does not comply with La. R.S. 49:958. But as directed by the jurisprudence in our judicial review of this case, we examine both the explicit and the implicit factual findings of the Board to determine whether its conclusions that Mr. Miller exercised control over the Museum and that he owned more than 25% of or exercised control over Enterprises comply with La. R.S. 49:964(G).

C. Appellants' Conduct

1. The Museum
The Board concluded that the Museum violated La. R.S. 42:1111(C)(2)(d) when it received $2,250 for a gin rummy tournament while Mr. Miller was employed as the Shreveport Airport Director and when the City of Shreveport and its airport authority were negotiating and administering a lease for the development of a golf course in which Hollywood Casino-Shreveport *1175 had an interest. The Museum's appellate complaint is that the evidence fails to establish that Mr. Miller exercised control over the Museum.
Mr. Miller testified that he co-founded the Museum, working alongside his wife. He admitted that during the negotiations and administration of the lease, he served on the Museum's board of directors and was its treasurer.
Among the multiple policy objectives of the Code are impartiality, fairness and equality of treatment toward those dealing with government; assurance that decisions of public importance will not be influenced by private considerations; maintenance of public confidence in government (wherein enters the matter of appearances); and prevention of use of public office for private gain. La. R.S. 42:1101(B). Glazer v. Com'n on Ethics for Public Employees, 431 So.2d 752, 755-56 (La.1983). The primary objective of the Code is to prevent public officers and employees from becoming involved in conflicts of interests. A conflict of interest is a situation which would require an official to serve two masters, presenting a potential, rather than an actuality, of wrongdoing. The wrongdoing does not have to occur in order for a prohibited conflict to exist. A public official may have done no wrong in the ordinary sense of the word, but a conflict of interest may put him in danger of doing wrong. The Code is aimed at avoiding even this danger. For this purpose, the Code identifies certain types of conflicts of interests and prohibits conduct by public officials which would bring these conflicts into being. Additionally, the Code empowers the Board to determine when a conflict of interests exists and to impose certain sanctions. Glazer, 431 So.2d at 755-56.
The prohibited conflict of interest involved in this case is one in which the public servant receives compensation from private persons doing business with his public agency for outside services rendered by the servant to that person. The danger in the conflict, of course, is that the public servant's official dealings with the person may be unduly influenced contrary to the public interest by the public servant's receipt of outside compensation from the same person. The danger exists even if the public servant actually performs bona fide services for his outside income. Accordingly, the Code specifically prohibits any public servant from receiving anything of economic value for or in consideration of services rendered to or for any person if such public servant knows or reasonably should know that such person has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency. La. R.S. 42:1111(C)(2); 42:1115(A); Glazer, 431 So.2d at 755-56.
With these precepts in mind, we find no error in the Board's conclusion that as a member of the Museum's board of directors and its treasurer, Mr. Miller possessed the requisite power to exercise control over the nonprofit corporation. That Mr. Miller did not actually utilize his position to exercise control over the Museum is not relevant since a wrongdoing does not have to occur in order for a prohibited conflict to exist. Because Mr. Miller was both a director of the Museum and the Director of the Shreveport Airports at a time when the lease for construction of the golf course was administered by him on behalf of his employer and while the financially-strapped nonprofit corporation received $2,250 for the three-day gin rummy tournament from Hollywood Casino-Shreveport, Mr. Miller's official dealings with Hollywood Casino-Shreveport created the potential for him to be unduly influenced, contrary to the public interest, by *1176 his receipt of private compensation from the golf-construction lease partner. Thus, while the evidence may not establish any actual wrongdoing, it does support a finding that as a director and treasurer of the Museum, Mr. Miller permitted himself to be in a position in which undue influence contrary to the public interest could have occurred. The explicit and implicit factual findings of the Board are sufficient to support the conclusion that the Museum violated Section 1111(C)(2)(d) of the Code.

2. Enterprises
The Board concluded that Enterprises violated La. R.S. 42:1111(C)(2)(d) when the company entered into the lease for parking space with Hollywood Casino-Shreveport while Mr. Miller worked as the Director of Airports and Hollywood Casino-Shreveport was a general partner in the lease to construct the golf course on airport property. On appeal, Enterprises maintains that the evidence fails to establish that Mr. Miller owned more than 25% of Enterprises or exercised control over the limited liability corporation.
The testimonial and documentary evidence established that the membership of Enterprises consisted solely of Mr. and Mrs. Miller during the time Hollywood Casino-Shreveport was involved with both the golf course lease and the parking lot lease with Enterprises. Although Mrs. Miller testified that she believed that she owned approximately 90% of Enterprises based on her monetary contributions to the limited liability company, she admitted no written operating agreement existed which altered the powers of the membership set forth in the Articles of Organization, which gave each member the authority to alienate, lease, or encumber the immovable property of Enterprises.[3] The record also demonstrates that during the time that Hollywood Casino-Shreveport had both the golf course and the parking-space leases, Mr. Miller had the right to and did deposit and execute checks on behalf of Enterprises. This evidence along with the explicit factual findings of the Board supports the conclusion that Mr. Miller owned more than 25% of Enterprises or exercised control over Enterprises and, as such, that the limited liability company violated La. R.S. 42:1111(C)(2)(d). As with his relationship with the Museum, that Mr. Miller did not actually utilize his position to exercise control over Enterprises is irrelevant since a wrongdoing does not have to occur in order for a prohibited conflict to exist. Because Mr. Miller was both a member of Enterprises and the Director of the Shreveport Airports at a time when the lease for the golf course was administered by him on behalf of his employer and while Enterprises received $4,000 a month for the rental of parking space to Hollywood Casino-Shreveport, Mr. Miller permitted himself to be in a position in which, contrary to the public interest, the potential for undue influence could have occurred.
For these reasons, we find no error in the Board's conclusions that the Museum and Enterprises violated the Code of Governmental Ethics.

III. DECREE
Finding no prejudice to appellants' substantial rights, we affirm the opinion of the Louisiana Board of Ethics. Appeal costs are assessed to Ark-La-Tex Antique and Classic Vehicles, Inc. and Ark-La-Tex Antique *1177 and Classic Vehicles Enterprises, L.L.C.
AFFIRMED. MOTIONS TO SUPPLEMENT DENIED AS MOOT.
NOTES
[1] Appellants filed a motion with this court asking to supplement the record with various letters and proposed opinions submitted by appellants and Mr. Miller. The Board also filed a similar motion, requesting supplementation of the record with the transcript of the June 2, 2005 public hearing. Both motions were referred to the merits. See In Re: Ark-La-Tex Antique and Classic Vehicles Enterprises, L.L.C., XXXX-XXXX (La.App. 1st Cir.1/09/06) (an unpublished opinion); In Re: Ark-La-Tex Antique and Classic Vehicles Enterprises, L.L.C., XXXX-XXXX (La.App. 1st Cir.1/26/06). Because we have ordered supplementation of the record on our own motion, both motions to supplement are rendered moot and, therefore, denied.
[2] A change to the Board's signature page to reflect the expiration of the terms of two of the members was also adopted.
[3] See La. R.S. 12:1323 (stating that the profits and losses of a limited liability company shall be allocated among the members and among classes of members in the manner provided in a written operating agreement, and that to the extent the operating agreement does not so provide in writing, profits and losses shall be allocated equally among the members).