SUMMERS, Justice.
 

 Since colonial days bar pilots have performed an essential service for passage of ships through the entrances of the Mississippi River at the confluence of these outlets with the Gulf of Mexico. Pilots have been and remain vital cogs in the river’s commerce.
 

 The organization and the operations of pilots engaged in this service have varied with changing times. As long ago as 1720
 
 *423
 
 pilots operated from a base on a small island stronghold known as the Balize near the river’s mouth. Their work in these early times was closely related to the military defense. Under France, under Spain, under the early United States, these men, also known as branch pilots, have performed this difficult and exacting task with skill and with an intimate knowledge of the channels, currents, bars and winds. Changing their headquarters and base of operations from time to time, their status and reputation rose and fell often influenced by the wielders of power at the passes. Always, however, they somehow served the vital function of moving vessels through the difficult channels of the river.
 

 Finally, in 1837, because of desultory practices, the legislature found it necessary to impose regulations upon pilots and to define their duties and responsibilities — an activity much in need of improvement, and of such overriding importance to commerce on the Mississippi,
 
 [1]
 
 must maintain reliable standards. By Act 106 of that year the Governor was empowered to appoint as many as 50 branch or bar pilots, no more. A board of three pilot examiners was created, members to be appointed from the pilots themselves. Qualifications were fixed and the pilots were required to provide a pilot boat of not less than 50 tons in constant readiness for service. They were also required to answer every request for a pilot upon penalty of losing their commission. These requirements prevail today. La.R.S. 34:941-34:963.
 

 Since this time all seagoing vessels moving between New Orleans and foreign ports must be navigated through the Mississippi River approaches to the Port of New Orleans by these pilots. See Kotch v. Board of River Port Pilot Comm’rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1946).
 

 As a result of the 1837 Act, a Pilots Association was chartered, and from this time a noticeable improvement in pilotage service and the caliber of men composing the Association became evident. The Association has been, from the beginning, unconsciously cooperative and guild-like with strong traditions and high standards. Each man owns an equal share in the property holdings and profits of the Association. It has all the, legal attributes of a partnership. Labor, voting power, and earnings are all equally shared by the members. Membership is restricted; when a member-pilot is admitted he must pay $25,000 for his share of the physical facilities. This amount is deducted from his earnings over a three-year period. Recruitment of new personnel is entirely under the control of the pilots.
 

 An apprenticeship program has been inaugurated in order that pilot replacements
 
 *425
 
 may meet the exacting standards of the work. Trainees must develop through three stages — the boatman, apprentice pilot and cub pilot.
 
 [2]
 

 Until 1968 the legislature fixed the rates chargeable by Associated Branch Pilots (bar pilots) engaged in piloting vessels in and out of the entrances of the Mississippi River between Pilottown and the Gulf of Mexico. La.R.S. 34:943, 34:944. Another association known as River Port Pilots is separately constituted and organized. La. R.S.. 34:991-34:1008. By legislative act river, port pilots are granted the exclusive right to pilot vessels between Pilottown and New Orleans. A third pilot group designated as the New Orleans and Baton Rouge Steamship Pilots was later created. Their duty is to pilot seagoing vessels from the port of New Orleans to, and including, the port of Baton Rouge and intermediate ports and return. La.R.S. 34:1041-34:1050. A ship entering the Mississippi from the Gulf of Mexico is piloted the twenty miles distance from the mouth of the river to Pilottown by bar pilots through the “passes”. Between Pilottown and New Orleans, a distance of approximately ninety miles, ships are piloted by river pilots. From New Orleans to Baton Rouge, a distance of 140 miles, the New Orleans-Baton Rouge pilots have sole authority to pilot foreign vessels.
 

 Fees and rates were, until 1968, fixed by the legislature for each
 
 oí
 
 these pilot associations. Historically, under this system, bar pilots received the highest compensation for their services. In recent years, however, compensation of the other pilot groups gradually increased reducing the disparity.
 

 By Act 579 of 1968 (La.R.S. 34:1121-34:1127) a Pilotage Fee Commission was created for each pilot association. These commissions are composed of four members of the particular pilot association and four members representing the steamship industry they serve. They are known as pilot and industry commissioners'. ' The Louisiana Public Service Commission serves as a member of each pilotage fee commission in the event that the pilot and industry commissioners arc unable to resolve any dispute as to rates. Commissioners representing either pilots or industry may certify any proper issue to the Public Service Commission for adjudication when they cannot agree. The decision of the Public Service Commission constitutes the decision of the pilotage commission.
 

 No change in the. rates charged:by the bar pilots has been granted by legislation •since 1960. On the'other hand, increases have been granted by the- Pilots. Fee Commission to the river port pilots and the New Orleans-Baton Rouge pilots to the ex
 
 *427
 
 tent that the earnings oí river pilots rose above that of bar pilots, and the Baton Rouge pilots now earn as much.
 

 Accordingly, in early 1969 the pilot commissioners of the Associated Branch Pilots requested a meeting of the entire Pilots Fee Commission to consider a proposal for an increase in rates and charges for services rendered by the bar pilots. A counter proposal by the industry commissioners aimed at equalizing the earnings of the bar pilots and river pilots was also submitted to the Pilot Fee Commission. When a majority of the Pilot Fee Commission could not agree upon a revision of existing rates, the industry commissioners certified the question to the Public Service Commission.
 

 After a series of hearings in January, February and March of 1970 the Public Service Commission issued its order in November 1970 fixing the following fees for pilotage services of the bar pilots:
 

 The said Bar Pilots shall be entitled to ask and to receive the following fees for their pilotage services:
 

 $8.15 per foot of water drawn in fresh water by vessels piloted by them, provided that should any vessel have a draft of 15 feet or less, the pilotage charge shall be $120.00 which shall be the minimum charge for such service.
 

 The said Bar Pilots shall also be entitled to demand and receive, from every vessel subject to pilotage in the above paragraph, an additional charge based on the greater deadweight tonnage listed in Lloyd’s Register, as follows :
 

 $20.00 for vessels of at least 21,000 deadweight tons, together with increments of $2.50 for each 1,000 deadweight tons in excess of 21,000 deadweight tons.
 

 When pilot services are timely offered and refused, said vessel shall pay such charge.
 

 Said Bar Pilots shall also be entitled to enter agreements with the masters or owners of ships and vessels for special services and the hire of boats and equipment, and the like, at such rates and for such sums as may be agreed upon between them.
 

 Vessels of one hundred tons or under, lawfully engaged in coast-wise trade of the United States shall not be required to take a pilot, unless the master of such vessel demands pilot service.
 

 In the event a pilot is detained more than two hours for any cause, except grounding, a detention charge shall apply thereafter and be paid per hour, or fraction thereof, at an hourly rate of $10.00.
 

 Detention on grounded vessels begins when a pilot has been aboard for twelve (12) hours, which shall be
 
 *429
 
 charged at the rate of $10.00 per hour thereafter, unless otherwise agreed.
 

 All charges authorized herein shall bear as a lien upon the vessels subject thereto.
 

 Being dissatisfied with this result the industry commissioners instituted suit in the Nineteenth Judicial District Court to set .aside and annul the Public Service Commission order and for establishment of rates in keeping with those proposed by the industry commissioners, the rates to be effective November 4, 1970. The pilot commissioners intervened in support of the Public Service Commission order. La.R.S. 45:1191-1192.-
 

 The matter was submitted on the record before the Public Service Commission; whereupon, the trial judge annulled the order of the Public Service Commission and fixed the rates as proposed by the industry commissioners. The matter is before us on the suspensive appeal of the pilot commissioners on behalf of all bar pilots. La. Const. art. 6, § 5. This is the first case heard by the Public Service Commission or the courts involving the fixing of rates for pilots.
 

 In 1960 each bar pilot earned $31,178.27. In 1968 each pilot earned $26,914, less $2,000 required for debt repayment. Thus, as operating costs and living costs experienced marked increases, earnings of bar pilots were appreciably reduced.
 

 Training for bar pilots is exacting and demands years of experience, study and practice. A prospect aspiring to become a pilot must have at least a high school education. He must spend at least one year at. sea on deck duty with the Navy, Coast Guard or Merchant Marine. Thereafter he must be employed as a boatman at pilot stations for one year. His duties in this employment include operation and maintenance of the various boats in use by the bar pilots and the performance of sundry duties at the pilot stations, duties designed to develop an overall familiarity with the stations’ operation and its personnel.
 

 Next, the pilots vote upon the trainee’s suitability for further training as an apprentice. If the vote is favorable he is assigned to duties. These duties require that he work in cycles of thirty days on and one week off earning about $200 monthly. Four to seven years in this capacity is the usual tenure.
 

 If the pilots approve his advancement to this next stage of training, he must earn a Coast Guard license for piloting in the passes of the Mississippi River, the Mississippi Gulf Outlet and the Mississippi upriver to Southport, a point a short distance above New Orleans. Cub pilots work six months to a year under the direct supervision of a commissioned pilot, piloting vessels daily. He is then eligible to take the examination to qualify as a pilot.
 

 
 *431
 
 If he succeeds, his commission issues from the Governor and he becomes a pilot; as -such he is a State Officer. La.R.S. 34:941-34:965; Levine v. Michel, 35 La.Ann. 1121 (1883); State ex rel. Egan v. Follett, 33 La.Ann. 228 (1881); Williams v. Payson, 14 La.Ann. 7 (1859). Throughout he must have demonstrated physical adaptability to the rigors of the service and psychological adjustment to the unorthodox life style of the pilot. He must have been inculcated with the
 
 esprit de corps
 
 of the association.
 

 Aside from the qualifications they must meet, bar pilots must provide and maintain a .considerable establishment of stations, compiunications facilities, boats and personnel. Performance of their duties would be. impracticable otherwise, because the mouth of the Mississippi River is remote and isolated, inaccessible by land, almost 100 miles from New Orleans. Venice, a small settlement on the west bank of the river, is the nearest community, roughly
 
 8]/2
 
 miles above Pilottown, the nearest pilot station.- For these reasons pilots must .maintain stations with living quarters. Here .they live for fixed periods near the scene of the piloting operation.
 

 As the river nears the Gulf of Mexico it broadens and then branches into a number of outlets in low-lying silt'terrain, marsh lands, formed by the river’s deposits. Two of these outlets, South Pass and Southwest Pass, are jettied and in use. Other channels are too shallow for seagoing vessels. The point where the river branches into these outlets is called head of passes. The bar pilots maintain and operate Pilottown at this location as the principal station of the system. Roughly fourteen miles below, a pilot station is maintained in South Pass. Another station is maintained at Southwest Pass, 17 miles from Pilottown. All three stations are manned by bar pilots and auxiliary personnel employed by them. From these vantage points they serve foreign ships entering and leaving the river.
 

 Bar pilots, in addition, guide vessels entering the port of New Orleans through the Mississippi River Gulf Outlet, a man-made channel 25 miles east of the river, connecting the Intracoastal Waterway on the north with the Gulf of Mexico. To service this channel the bar pilots either maintain a pilot boat at the channel’s seaward end, or, upon signal, they meet vessels entering there by boat expedited from one of the three stations.
 

 Pilot stations consist of a main building, auxiliary outbuildings, towers, docks arid walkways. All are constructed on piling in the mosquito-infested marsh characteristic of the locale. Variations have been necessary, however. F.or instance, .the, .Southwest Pass station suffered tornado .damage in February .1970, making it necessary to charter a crew boat to house personnel .unt,il satisfactory quarters, could be ,,constructed.
 

 
 *433
 
 Rain or cistern water is used at the stations. The limited supply makes it available for drinking only. River water is used for bathing. Distillation plants are needed. They will cost $20,000 per station. The quarters occupied by the pilots are crude and inadequate, some of the wooden buildings have been in use for more than fifty years. All pilots must sleep in one large dormitory-like room. Remodeling of these facilities is planned at an estimated cost of $200,000, but the needs cannot be met under the existing rates and charges.
 

 An administrative office with staff headed by the President of the Pilots Association is quartered in New Orleans at the International Trade Mart Building. It is essential for administrative purposes and to maintain liason and communications with the shipping industry.
 

 Costs of furnishings and fixtures at the three stations is estimated at $306,406.50. Boats in use are valued at $399,140.50. Value of the stations is exemplified by the $149,000 estimated cost of replacing the building at South Pass, recently severely damaged by hurricane. A permanent boat or station is contemplated for the Mississippi Gulf Outlet. It will cost in excess of $250,000 according to 1963 estimates. It has often been necessary in the past for the bar pilots to borrow money to build boats, stations and other facilities. Each pilot .contributes from his income to the 'discharge of these debts. In addition, when pilots are required to retire because of disability, it has been the practice in most cases for the working pilots to contribute $500 per month to those retirees. At the time of the hearing, seven received those benefits.
 

 Because of the location of the stations in close proximity to the open sea, the low-lying marsh providing no buffer from storms, frequent hurricane damage has been the rule. Costs of repairs must be assumed by the pilots from income received for their services.
 

 Storm exposure makes it necessary for the pilots to assume the risk of self-insurers, and insurance coverage is unavailable for the pilot stations, walks, bays and dock. Although boat insurance is available,, a $5,000 deductible clause is part of those policies.
 

 A.M. and V.PI.F. radio communications are used between stations and boats. A land line telephone facility is maintained between Pilottown and the nearest main line. These communications aids serve to coordinate rendezvous between pilots and vessels using the passes or the gulf outlet.
 

 In order to accomplish their mission, the bar pilots must provide and maintain seven boats, including one 65-foot aluminum hull, twin-screw vessel of 54 tons. A similar boat, valued at $90,000, was sunk by a depth charge some time ago.
 

 
 *435
 
 No other pilotage organization in the United States has the responsibility of providing and maintaining as many stations, communications facilities, boats and auxiliary personnel. The properties devoted to these functions are valued in excess of one million dollars.
 

 Approximately 30 persons as boatmen, apprentices, cub pilots, cooks and utility personnel are employed by the Association. Employees
 
 are
 
 difficult to retain because of the remoteness of the stations, the unfavorable working conditions and the competition for workers brought about by offshore oil activity in the area. Too, the extended stay required away from community and family life creates social obstacles to recruiting personnel at these pilot stations.
 

 An effort was made to demonstrate by statistical data that bar pilots work few hours daily and the routes over which they pilot vessels through the river passes are short — South Pass being 17 miles from the gulf to Pilottown, while the distance through Southwest Pass is 24 miles. It is true that the time spent aboard the piloted vessel is brief and the distance through the passes is not great. However, these factors alone do not present the whole picture, for they do not take into account the need for pilots to travel by boat from Southwest Pass to the entrance of the Mississippi River Gulf Outlet to meet vessels entering there — a roundtrip distance of roughly S3 miles in the open waters of the gulf. It is sometimes necessary, also, to journey from Pilottown to Venice and thence by land via. New Orleans and south along the Mississippi River Gulf Outlet to Plopedale where vessels are boarded to be guided to the-gulf. This trip involves more than 100' miles of travel.
 

 Pilots are, moreover, shifted from station to station to keep them adequately manned. When pilots go out into the gulf to meet vessels, other pilots often ride with them in anticipation of the contingency that by the time they arrive at the boarding area another vessel may have come over the horizon and be in need of the extra pilot.
 
 Thereby
 
 a boat trip and valuable time of the vessel entering port are conserved.
 

 Bar pilots are on station two weeks and at home two weeks. They are, however, on call 24 hours a day while on station, and even while at home they are subject to call when needed. For this reason while at home they must not be more than eight hours away from station.
 

 These factors, not considered in the statistical tables presented, refute the contention that bar pilots work very few hours each day. What is important, however, is not how much actual time is spent piloting, but how much time these men devote to making themselves available when needed. It is, in effect, mostly a waiting game.
 

 Although the captain of the piloted ship does not relinquish command to the pilot in
 
 *437
 
 a legal sense, the responsibility for the safety of the vessel, its passengers, crew and cargo are essentially entrusted to the pilot. The pilot’s task is, indeed, impressed with grave responsibility.
 

 The pilot’s work is dangerous in some respects. Boarding vessels by ladders at night in rough seas outside the passes involves a definite element of risk. And the work must go on during inclement weather. Only extreme conditions will excuse a failure to respond to a call for a pilot.
 

 At this time 43 bar pilots compose the association, with four to be added. As mentioned, they work at the stations two weeks and arc at home two weeks. Most of them live in New Orleans or the surrounding area. The two weeks off is not a vacation as the industry commissioners intimate. This work cycle is common for offshore oil workers and others whose work requires them to live in isolated areas, away from family and community life. Men who go to sea in ships, particularly masters of merchant ships, receive commensurate off-time schedules. It would be virtually impossible to recruit competent personnel on a competitive basis without this off-time concession.
 

 Earnings of bar pilots in 1968 were $29,876.00. In 1969 the share of each in the net income derived from fees and charges after payment of expenses was $26,914, the decrease being attributable in part to a fifty-two day dock strike and expenditures made necessary by storm damage.
 

 The rates and charges of the bar pilots’s association should be fixed in such a manner that the public interest is best served. In order to accomplish this result the rates must provide a reasonable net personal income to the pilot in keeping with their skills, training, experience and the conditions under which their work must be performed. The income should be sufficient to attract and hold in service men with a high degree of skill and a deep sense of their important responsibility. Since such a net income cannot be predicted with mathematical precision because of variable factors, it suffices to say that at this time rates and charges should yield a net income between $35,000 and $40,000 per annum. To fulfill the mission assigned to pilots by the legislature these rates and charges must also enable the pilots to provide and maintain sufficient stations, boats and communication facilities with personnel to man them.
 

 To preserve the competitive position of the Port of New Orleans and the Port of Baton Rouge it may be necessary at times that these rates be adjusted in keeping with rates at other ports, with a proper regal'd for differences in geographical, operating and port conditions.
 

 The effort of the industry commissioners in this matter is principally directed to
 
 *439
 
 ward equalization of the income of bar pilots with that of the river pilots. But the evidence produced at the hearings has failed to satisfy us that this consideration is paramount. Similarity in working conditions has been pointed out to some extent, but no exhaustive showing has been made regarding the working style of river pilots while every aspect of the bar pilots’ work has been explored. Likewise little or no showing has been made concerning the physical facilities and auxiliary personnel river pilots are required to provide and maintain; whereas, this aspect of the case has been presented in detail insofar as the bar pilots are concerned. There is no convincing basis in this record to conclude that bar pilots should earn the same income other pilots earn.
 

 The contention of the industry commissioners, that the rates approved by the Public Service Commission will provide an income to the bar pilots out of proportion to their qualifications, is not supported by the ' record. Considering the extensive need for long overdue repairs to and replacement of physical facilities bar pilots must provide, and the need to add to and improve those facilities, the rates and charges fixed by the Public Service Commission are not excessive at this time. The rates and charges fixed represent a compromise between the proposals of the pilot commissioners and the industry commissioners. Furthermore, the Public Service Commission with its supervisory pow7 ers may make the necessary adjustment to the rates and charges indicated by future experience; and the expertise to be developed by staff members in this newly acquired regulatory field will enable the Public Service Commission to more properly formulate just and equitable rates and charges for the pilots, shippers and the public interest affected. Particular attention to the competitive posture of the ports of New Orleans and Baton Rouge is indicated by the cumulative charges ships must bear. The effect of pilot fees on these charges is significant.
 

 This Court has consistently held that findings of the Public Service Commission must be accorded great weight. Arkansas & La. Mo. Ry. v. Louisiana Public Service Commission, 251 La. 963, 207 So.2d 760 (1968); United Gas Pipe Line Co. v. Louisiana Public Service Commission, 241 La. 687, 130 So.2d 652 (1961); Texas & Pacific Railway Co. v. Louisiana Public Service Commission, 240 La. 669, 124 So.2d 902 (1960); Texas & New Orleans Railroad Co. v. Louisiana Public Service Commission, 233 La. 787, 98 So.2d 189 (1957).
 

 Findings of the Public Service Commission should not be overturned unless the record reflects an abttse of the Commission’s power. Louisiana Power and Light Company v. Louisiana Public
 
 *441
 
 Service Commission, 256 La. 656, 237 So.2d 673 (1970). In keeping with these principles, courts will not substitute their judgment or otherwise interfere with actions of the Public Service Commission “ . save and except when they are found to be arbitrary and capricious, or reflect a clear abuse of the power reposed in it by constitutional and statutory provisions.” Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Commission, 244 La. 909, 155 So.2d 15 (1963).
 

 In annulling and setting aside the rates and charges fixed by the Public Service Commission in the instant case, the trial judge was of the opinion that since this was a matter of first impression, not supported by prior adjudications on the same subject matter, and the Public Service Commission admittedly had not yet developed expertise in this field of regulation, he, the trial judge, was as competent to fix the rates and charges. In this approach we find the trial judge committed error. The role of courts in these cases is to ascertain whether, in fixing rates and charges, the Public Service Commission was arbitrary and capricious and rendered its order unsupported by evidence. If, applying these criteria to the Public Service Commission order, it is found the order was not rendered arbitrarily or capriciously and is supported by evidence in the record, courts must uphold those orders. On the other hand, if these tests are not met, the court may then make the necessary adjustment in the order or remand the matter to the Public Service Commission for proper action.
 

 The order of the Public Service Commission here is supported by the evidence — it is not arbitrary or capricious.
 

 A proper regard for the principles announced does not warrant setting aside the order of the Public Service Commission here. Although the income approved for the pilots by the trial court judge is substantially in keeping with that which we approve, the rates and charges approved by the trial court do not properly contemplate the costs of improvements, replacements and repairs required of the physical facilities the pilots must maintain. These needs are more adequately considered in the rates and charges approved by the Public Service Commission.
 

 For the reasons assigned, the judgment of the trial court is reversed and set aside, and the rates and charges fixed by the Public Service Commission are approved and made the judgment of this Court, reserving to the Louisiana Public Service Commission the right to revise these rates and charges hereafter.
 

 [1]
 

 . Kane, Deep Delta Country (New York: Duell, Sloan & Pearce 1944), pp. 119-131.
 

 [2]
 

 . Sítíomonc, An Occupational Study of Bar Pilots: A Sociological Analysis',
 
 passim
 
 (1961).