512 So.2d 370 (1987)
Channing F. HAYDEN, Jr., et al.
v.
LOUISIANA PUBLIC SERVICE COMMISSION, et al.
No. 87-CA-0898.
Supreme Court of Louisiana.
September 9, 1987.
Edward S. Bagley, New Orleans, for plaintiffs-appellants.
Marshall B. Brinkley, Baton Rouge, Walker H. Drake, Jr., Chalmette, Charles H. Junek, III, Arabi, Jerry J. McKernan, Larry S. Bankston, James H. Gill, Jr., Baton Rouge, Camp, Carmouche, Barsh, Gray, Hoffman & Gill, Baton Rouge, and Leon Sarpy, New Orleans, for defendants-appellees.
MARCUS, Justice.
This is an appeal by the industry commissioners of the New Orleans and Baton *371 Rouge Steamship Pilots Fee Commission (Fee Commission) from the affirmance by the Nineteenth Judicial District Court of Louisiana Public Service Commission Order No. T-16499 fixing pilotage rates charged by the New Orleans and Baton Rouge Steamship Pilots Association (NOBRA).
In April 1985, pilot members of the Fee Commission certified a dispute to the Public Service Commission involving pilotage rates to be charged by NOBRA to the vessels subject to pilotage traversing the Mississippi River between New Orleans and Baton Rouge. Shortly thereafter, the industry commissioners of the Fee Commission submitted a proposal to NOBRA offering an increase in pilotage rates similar to that implemented by the two other Mississippi River pilots associations, Associated Branch (BAR) and Crecent River Port (Crescent) pilots, of 5½ % effective in June 1985 and an additional 5½ % in June 1986 (an effective cumulative increase of about 11.3%). The NOBRA pilots rejected the offer. Hearings before the Public Service Commission thereafter commenced. The record in the case which included numerous depositions, production of documents, prefiling of testimony and examination and cross-examination of witnesses including economists, members of NOBRA and other pilots associations, both in Louisiana and elsewhere, steamship agents, port officials and business representatives, was completed about a year after certification of the dispute.
The Public Service Commission issued Order No. T-16499 on October 2, 1986. Concluding that parity in annual compensation between NOBRA pilots and Crescent pilots should be established because of the similarity of the work performed by the two associations, the Public Service Commission mandated specific NOBRA pilotage tariff increases calculated to add approximately $1.2 million a year to NOBRA pilotage revenue. The new NOBRA tariffs amounted to an overall average increase in pilotage rates of 17.7% using revenues of 1984 and 1985 as test years. The tariff changes were ordered to take effect as of midnight, October 31, 1986.
Dissatisfied with this result, the industry commissioners of the Fee Commission petitioned the Nineteenth Judicial District Court to reverse and set aside the Public Service Commission order.[1] The district court affirmed the Commission's decision finding that the Commission's order was not unreasonable or arbitrary and capricious. The industry commissioners appeal to this court from the district court decision. The question presented is whether the Public Service Commission acted unreasonably or arbitrarily in establishing fees for the pilotage services performed by NOBRA.
The role of the Public Service Commission in pilotage rate regulation is well settled. See Giallanza v. Louisiana Public Service Commission, 412 So.2d 1369 (La. 1982); Hendrix v. Louisiana Public Service Commission, 262 La. 420, 263 So.2d 343 (1972). There are three pilots associations in Louisiana which have the exclusive right to provide pilotage services to vessels subject to pilotage from the time they enter the Mississippi River from the Gulf of Mexico until they reach the port of Baton Rouge and similarly on the route back down the River to the Gulf. BAR pilots provide services in the Mississippi River between Pilottown and the Gulf of Mexico. La.R.S. 34:944. Crescent pilots service vessels between Pilottown and New Orleans. La.R.S. 34:992. NOBRA pilots service vessels between New Orleans and Baton Rouge. La.R.S. 34:1043. Each pilot group is organized in a pilots association. La.R.S. 34:944, et seq., 995, 1047.
Originally, pilots' fees were regulated directly by statute. La.R.S. 34:997-999. In 1968, however, the legislature established pilot fee commissions composed of four members of the pilots association and four members of the steamship industry. La. R.S. 34:1121. The pilot fee commissions *372 have authority to fix "reasonable and just... fees for pilotage services to ships and vessels, giving due regard to the length, draft and tonnage of the vessels ..., the difficulty and inconvenience of the particular service and the skill required to render it, the supply of and demand for pilotage services, the public interest in maintaining efficient, economical and reliable pilotage service and other factors relevant to the determination of reasonable and just rates...." La.R.S. 34:1122.[2] In the event that the pilot and industry commissioners are unable to resolve any dispute as to pilotage rates or any other legitimate business of the pilots association, the question may be certified to the Louisiana Public Service Commission by commissioners representing either pilots or industry. La.R.S. 34:1121. If the question of reasonable and just pilotage fees or any other matter is so certified, the decision of the Public Service Commission shall constitute the decision of the fee commission. Id. Giallanza, supra. Appeals from actions by the Public Service Commission in regulating pilot fees are governed by Article 4, Section 21(E) of the Louisiana Constitution, which provides that an appeal may be taken from any action by the Commission to the district court in its domicile and that a direct appeal from any judgment of the district court shall be allowed to the supreme court. Giallanza, supra.
The Public Service Commission, when acting in place of the Fee Commission, is charged with the responsibility of fixing and establishing "reasonable and just pilotage fees." La.R.S. 34:1122. In reviewing this rate making process the inquiry of the judiciary is generally confined to a determination of whether the Public Service Commission acted unreasonably or arbitrarily in establishing fees for pilotage services. Giallanza, supra. The findings of the Public Service Commission must be accorded great weight and should not be overturned unless the record reflects an abuse of the Commission's power. Hendrix, supra.
The increase in NOBRA pilotage rates ordered by the Public Service Commission was calculated to establish parity of annual compensation between NOBRA and Cresent pilots. Legitimate business costs of the associations were subtracted from the pilotage revenue to determine pilot earnings.[3] The calculation of parity provided for obvious differences between the two pilot groups. Crescent pilots were given the benefit of a 12.9% return on investment *373 on their capital assets maintained at Pilottown which include a watch station and two pilot transport boats. In addition, since it was established that the Crescent pilots spent more time "on the bridge" of piloted vessels, their compensation was proportionately increased. Aside from these differences, it was the Commission's conclusion, as reflected in its order, that the working conditions of the NOBRA and Crescent groups were sufficiently similar that "relatively little difference in compensation, if any, can be justified." Hence, the Commission ordered a rate increase of approximately 6.4% more than the increase offered to NOBRA (11.3%) by industry commissioners at the commencement of the proceeding before the Commission in order to achieve parity in compensation between NOBRA and Crescent pilots.[4]
The industry commissioners contend that the Commission's order establishing parity in annual compensation between the NOBRA and Crescent pilots is arbitrary and capricious in that it uses "bootstrap logic." It is argued that the Commission made the basic presumption that the pilotage rates charged by Crescent pilots were reasonable and just. The Commission further concluded that parity in annual compensation would be reasonable as the two pilot groups perform the same basic pilotage services under similar working conditions for vessels traversing the Mississippi River between Pilottown and New Orleans (Crescent route) and New Orleans and Baton Rouge (NOBRA route). The industry commissioners contend, however, that Crescent pilots are overcompensated based upon the opinion of an economist employed in the economics and rate analysis division of the Commission. Hence, the Commission's basic presumption is invalid.
In a report prepared in conjunction with this case, the Commission's staff economist stated that "the best estimate of a Mississippi River pilot's opportunity cost is the $48,500 earned by Masters and pilots of `line boats' in the lower Mississippi River." The report concluded that from an economic perspective, each of the pilot groups was overcompensated.[5] Thus, industry commissioners take the position that NOBRA pilots are not entitled to any increase in pilotage rates.
In our review of the voluminous record before the Public Service Commission, we find insufficient evidence to support the conclusion that NOBRA pilots should be compared to masters and pilots of line boats in determining the appropriate level of annual compensation for the former. Moreover, Crescent pilots earned $96,421 and $92,970 in 1984 and 1985, respectively, before considering the 11.3% cumulative rate increase over the years 1985 and 1986 offered by industry and accepted by the Crescent pilots. Under the circumstances, the $48,500 earned by masters and pilots of line boats provide an inappropriate comparison in determining the economic worth of Mississippi River pilots. Rather, we consider it more logical to compare Mississippi River pilots to each other as much as is feasible in determining a fair compensation for the services they provide. Considering industry's offer and Crescent pilots' acceptance of the 11.3% rate increase, we are unable to say that the Commission erred in assuming that the Crescent pilots are reasonably compensated for their services. We therefore find no merit to the industry commissioners' bootstraping argument.
The industry commissioners next argue that the Commission's rate increase order is arbitrary because the Commission failed to establish that NOBRA pilots were performing an appropriate level of full-time work for Mississippi River pilots. Industry maintains that the Commission previously established a standard for the appropriate *374 level of full-time pilot work at 221 turns[6] per year in its Order No. T-14274-A relating to a rate case involving Crescent pilots. Since it was established in the instant case that a typical NOBRA pilot performed an average of only 168.69 turns and 166.33 turns in 1984 and 1985, respectively, industry claims that they are not performing a full-time work schedule and are not entitled to an increase in pilotage rates.
Order No. T-14274-A was a clarification by the Commission pursuant to an order of this court in Giallanza, supra. The Commission was addressing the issue of the Crescent pilots' request to add 20 pilots to the pilots association. The Commission estimated that the pilotage rate increase ordered would be sufficient to maintain the pilots' level of annual compensation at its then current amount while decreasing the annual turns per pilot to approximately 221. We do not consider that the Commission was setting a standard for full-time pilotage. The approach used by the Commission in the instant case was to compare the average bridge time per turn for the NOBRA and Crescent pilots in the test years of 1984 and 1985. The bridge time or time that the pilot is actually aboard the vessel to be piloted, was estimated to be 5.5 hours per turn for both NOBRA and Crescent pilots. The Commission's order proportionately compensated Crescent pilots for the additional total annual bridge time performed by them in its calculation to establish parity.[7] We are unable to say that this is an unreasonable approach in light of our finding that the pilotage rates charged by the Crescent pilots are reasonable and fair.
The Commission, in its order, provided as follows:

Working ConditionsRelative working conditions is one factor to be considered in determining an appropriate level of compensation for the NOBRA pilots. Although the difficulties and hazards of each route on the Mississippi River are different, whether a determination can be made as to which is the most difficult is unclear. However, there are obvious differences in the living conditions of the on-duty pilots in each group. Since the BAR pilots' situation is distinctly different, and more onerous, than that of the other two groups, a differential in compensation is appropriate. Conversely, since the situation of the Crescent and NOBRA pilots are more similar, relatively little difference in compensation, if any, can be justified. Therefore, we will confine our attention to comparing the NOBRA and Crescent pilots. [Emphasis added.]
The Commission's conclusions that "the BAR pilots situation is distinctly different, and more onerous than that of the other two groups" and "the situation of NOBRA and Crescent pilots [is] more similar, [such that] relatively little difference in compensation, if any, can be justified," were not seriously challenged in the record before the Commission. In fact, our review of the record reveals relatively little testimony directly addressing these points. The above conclusions seemed to have been assumed by the parties representing industry and NOBRA. Evidence was presented that the Crescent pilots maintain a pilot station and transport boats at Pilottown, while NOBRA pilots proceed from their homes by automobile to and from their job assignments. Additionally, testimony was given as to differences in the qualifications of membership of the two groups. There was, however, enough evidence of similarity in the working conditions aboard the piloted vessels between the NOBRA and Crescent pilots to support our finding that the conclusion reached by the Commission was neither arbitrary nor capricious.
In addition, testimony was offered from pilots from the ports of Tampa Bay, Florida *375 and Gulfport, Mississippi. Both pilots were familiar with the pilotage route on the Mississippi River between Pilottown and Baton Rouge, the combined routes of the Crescent and NOBRA pilots. Both acknowledged that piloting vessels on the Mississippi River was much more difficult than at his respective port. The Tampa Bay pilot reported that his annual compensation was approximately $137,000 per year. He testified that had he been given a choice of membership in either association, he would have chosen membership in the Tampa Bay association due to the ability to earn more money on a shorter run. The Gulfport pilot testified that he earned approximately $50,000 per year. He testified that his port does not handle the volume or size of vessels that traverse the Mississippi River. He added that only four pilots were members of his association.
The increase in NOBRA pilotage rates ordered by the Public Service Commission was calculated to establish parity of annual compensation between NOBRA and Crescent pilots. Based upon our review of the record, we are unable to say that the Public Service Commission acted unreasonably or arbitrarily. Accordingly, we will affirm the judgment of the district court affirming Public Service Commission Order No. T-16499.

DECREE
For the reasons assigned, the judgment of the Nineteenth Judicial District Court affirming Public Service Commission Order No. T-16499 is affirmed.
NOTES
[1] The industry commissioners filed a motion to stay the order of the Public Service Commission and alternatively to require that the funds representing increased pilotage rates be placed in an escrow account pending determination of the issues on appeal. This motion was denied. Hence, the rates as fixed by the Public Service Commission have been in effect since midnight, October 31, 1986.
[2] La.R.S. 34:1121 and 1122 have been amended and reenacted effective as of June 29, 1987. Article 1122(C), as revised, provides as follows with respect to guidelines for determining pilotage fees:

C. (1) In determining such fees and rates, individual pilotage fee commissions may give due regard to, but shall not be limited to:
(a) Consideration of the length, draft, dimensions, and tonnage of the vessels to be piloted.
(b) The difficulty and inconvenience of the particular service and the skill and additional expertise required to render it.
(c) The public interest in maintaining safe, efficient, and reliable pilotage service.
(d) The piloting time required; the distance traveled of the vessels to be serviced; the travel time required and distance traveled to and from vessels; the method of travel and travel cost required to and from vessels; the time devoted by pilots to making themselves available when needed; the time required to be on station or on call while both on and off station; the length of time duty requires the pilot's absence away from home; the difficulty of the particular service including working conditions; risk factors of the route; inconvenience and living conditions; the skill and additional expertise required to render the particular service; the length of the training, experience, or apprenticeship program; and the number of trips the pilot is required to ride light.
(e) Another factor relevant to the determination of reasonable and just fees and rates, including those factors previously considered and determined by the Louisiana Supreme Court, and the national average pilotage cost per mile for state regulated pilots operating in United States ports.
(2) If any standard for establishing pilotage fees and rates set forth herein is not applicable to a particular pilot service, then it shall not be considered in the determination of fees and rates for such service.
[3] Expenses not included as legitimate business costs of the association were pilots' hospitalization expense, death and retirement benefit contributions, dues and subscriptions, radar school, physical exams and reimbursement for individual pilot expenses. Since pilots are self-employed, the cost of these items are considered as part of the pilots' earnings.
[4] The rate increase differential of 6.4% was calculated using the data provided by the Public Service Commission Order, Exhibit 3, by subtracting the industry commissioners' offer to NOBRA of approximately 11.3% (rate increase implemented by BAR and Crescent pilots) from the average increase in NOBRA revenue ordered by the Commission of approximately 17.7% (calculated average percentage increase in revenue using 1984 and 1985 as test years).
[5] According to Exhibits 1 and 2 of the Commission's order, NOBRA pilots earned compensation of $84,228 and $85,241 in 1984 and 1985, respectively. Crescent pilots earned $96,421 and $92,970 in 1984 and 1985, respectively.
[6] A turn is a unit of measure of pilotage service performed.
[7] In 1984, the average number of turns per pilot was 168.69 for the NOBRA pilots and 178.15 for the Crescent pilots. Thus, average annual bridge time (5.5 hours per turn for NOBRA and Crescent pilots) for a NOBRA pilot was 928 hours, while average annual bridge time for a Crescent pilot was 980 hours or 5.61% more than for a NOBRA pilot. In 1985, the average number of turns per pilot was 166.33 for the NOBRA pilots and 169.59 for the Crescent pilots. Thus, average annual bridge time for a NOBRA pilot was 915 hours, while average annual bridge time for a Crescent pilot was 933 hours or 1.96% more than for a NOBRA pilot.