United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 24, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 04-30666
_____

TERRY C. COLEMAN,

                                    Plaintiff - Appellant,

                    versus

NEW ORLEANS AND BATON ROUGE STEAMSHIP PILOTS' ASSOCIATION,

                                    Defendant - Appellee.
_____

No. 04-30700
_____

TERRY C. COLEMAN,

                                    Plaintiff - Appellant,

                    versus

CRESCENT RIVER PORT PILOTS ASSOCIATION, INC.,

                                    Defendant - Appellee.
_____

TERRY C. COLEMAN,

                                    Plaintiff - Appellant,

                    versus

BOARD OF RIVER PORT PILOTS COMMISSIONERS,

                                    Defendant - Appellee.
_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

Before JONES, Chief Judge, JOLLY and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this age discrimination case, the question is whether the Mississippi River pilot associations are "employers" of the member pilots for the purposes of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et. seq. The question is difficult and yields no straightforward answer. The defendant associations are long-standing, peculiarly conducted institutions recognized by statute, owned and governed by their member pilots, and serving as a sort of clearinghouse and dispatching service for the river pilots. There is no doubt that if the plaintiff suffered age discrimination, it was administered by the hands of the defendant associations because of their age-restrictive policies. Yet, there is an absence of any traditional employer relationship, traditional independent-contractor relationship, hiring-hall relationship, or employment-agency relationship between the associations and the pilots.

Terry Coleman ("Coleman"), born October 1, 1951, brought suit against the New Orleans & Baton Rouge Steamship Pilots Association ("NOBRA") and the Crescent River Port Pilot's Association ("Crescent"), as well as the Board of River Port Pilot Commissioners (the "Crescent Board"), alleging that these entities unlawfully discriminated against him on the basis of his age in violation of the ADEA. They did so, he claims, by refusing to elect him into their respective pilot apprenticeship programs because he was too old under their membership qualifications. The

2

District Court granted summary judgment in these separately filed actions to NOBRA, Crescent, and the Crescent Board, holding that these entities are not "employers" within the meaning of the ADEA and therefore cannot be held liable under the ADEA. Because both cases present similar legal issues, we consider them together in this opinion.

We hold that NOBRA, Crescent, and the Crescent Board are not "employers" of river pilots within the meaning of the ADEA. These entities are therefore not subject to the ADEA's prohibitions on age discrimination in employment. Accordingly, we AFFIRM the District Court's grants of summary judgment to NOBRA, Crescent, and the Crescent Board.

I

In our effort to determine whether any of the defendants meet the definition of "employer" under the ADEA, we must first understand Louisiana's body of rules and regulations governing the licensing of Mississippi River pilots and the relationship among pilots, boards of examiners, and pilots' associations in the operation of the pilot apprenticeship programs. Only then can we fully understand the organizational structure of the defendant pilots' associations and its bearing on the question of liability under the ADEA.

A

Louisiana state law requires that local pilots guide foreign ships along Louisiana waterways, including the Mississippi River.

3

The Louisiana portion of the Mississippi River is divided into three zones.  See generally Hendrix v. Louisiana Public Service Commission, 263 So.2d 343, 345 (1972).  "Bar pilots" or "associated branch pilots" guide vessels in and out of the entrance of the Mississippi River between Pilottown and the Gulf of Mexico.[1]  LA. REV. STAT. § 34:941, et. seq.  "River port pilots" guide vessels between Pilottown and New Orleans.  LA. REV. STAT. § 34:991, et. seq.  "New Orleans and Baton Rouge Steamship Pilots" guide seagoing vessels from the port of New Orleans to the port of Baton Rouge and intermediate ports.  LA. REV. STAT. § 34:1041, et. seq.  An individual who wishes to serve as a pilot in any of these zones must receive a commission from the Governor of Louisiana entitling him to work as a pilot on a particular stretch of the river.  Receiving a commission is a multi-step process.

Regulation of the process of applying to be a pilot is mainly the responsibility of the state regulatory boards created for this specific purpose.  The Board of River Port Pilot Commissioners ("Crescent Board") is authorized by statute to "hold examinations under such rules and regulations, and with such requirements as they shall have provided," to certify to the Governor that applicants are qualified to be river port pilots.  LA. REV. STAT. § 34:991, 993.  The Board of Examiners for the New Orleans and Baton Rouge Steamship Pilots ("NOBRA Board") is similarly authorized to

---

[1]Bar pilots and their association are not at issue in this case.

certify qualified applicants to the Governor to be New Orleans and Baton Rouge Steamship Pilots. LA. REV. STAT. § 34:1042, 1045. Each of these boards is comprised of three citizens holding commissions for the appropriate stretch of the river. LA. REV. STAT. § 34:991, 1042. The Governor appoints individuals to serve on the commissions. Id.

An individual must first petition the appropriate board for a determination of his qualifications.[2] A few specific requirements for qualified pilots are set out by statute. Before the Crescent Board may certify the candidate to the Governor for commissioning, river port pilots are required to (1) be of good moral character, (2) be a voter of the state of Louisiana, and (3) have completed an approved apprenticeship program. LA. REV. STAT. § 34:993. New Orleans and Baton Rouge Steamship Pilots are required by statute to (1) be of good moral character, (2) be a voter of the state of Louisiana, (3) have a first class pilot license issued by the United States Coast Guard, and (4) complete a six-month apprenticeship. LA. REV. STAT. § 34:1045.

The Crescent Board and the NOBRA Board are authorized by statute to provide additional requirements for individuals seeking to become pilots. Among myriad licensing and educational requirements, the Crescent Board requires that the individual "must

---

[2]This exact process does not appear to be mandated by statute, but rather the result of the regulations promulgated by the boards of commissioners/examiners and the respective pilots' association for the particular stretch of the river.

not have reached his <u>fortieth birthday</u> prior to the first day of balloting on apprentices by the river port pilots." LA. ADMIN. CODE tit. 46 § 3201(C) (2003) (emphasis added). The NOBRA Board requires that the individual "shall not have reached his or her <u>forty-fifth birthday</u> before being commissioned." LA. ADMIN. CODE tit. 46, § 6107 (2003) (emphasis added).

An individual applying to be an apprentice first submits his application to the appropriate board of commissioners/examiners for certification that the individual is a qualified apprentice candidate. Because apprenticeships must be completed under the supervision of a commissioned pilot, and because only a limited number of pilots are allowed by law, certification by the board as a qualified candidate does not guarantee an individual a place in the apprenticeship program. The individual must then be elected to apprenticeship by a majority vote of the pilots' association for the respective stretch of the river.

Once elected, the candidate completes a board-certified apprenticeship program under the supervision of commissioned pilots. The boards retain the right to require satisfactory completion of the apprenticeship program, extend the apprenticeship, or terminate the apprenticeship when deemed necessary. LA. ADMIN. CODE tit. 46, § 6107(L) (2003). Upon completion of the apprenticeship program, the boards examine the apprentices as to their knowledge of pilotage and their proficiency and capability to serve as commissioned pilots. LA. ADMIN. CODE tit.

6

46, § 6107(M)(2) (2003). If the board deems the apprentice qualified, the board certifies the apprentice to the Governor for commissioning. The Governor may then appoint, in his discretion, the individual to an existing vacancy. LA. REV. STAT. §§ 34:993, 1045.

B

The pilots' associations that elect individuals to apprenticeships exist pursuant to Louisiana law giving pilots the right to "form themselves into an association or associations as to them may seem fit, not in conflict with law . . . ." LA. REV. STAT. § 34:995; LA. REV. STAT. § 1047. Crescent and NOBRA periodically hold elections for apprenticeship when each respectively determines that a need exists for new pilots. The associations select only the number of apprenticeship candidates commensurate with the number of new pilots needed.[3]

Crescent and NOBRA are incorporated under the laws of

---

[3]The NOBRA Board's regulations provide that an applicant "must have been duly elected an apprentice in the New Orleans and Baton Rouge Steamship Pilots Association as per Association rules in effect as of such application." LA. ADMIN. CODE tit. 46, § 6107 (2003). The legal source of this voting process for the Crescent Board and Crescent is unclear. We have found nothing in the law requiring only so many individuals be apprenticed as there are open seats, although this does make practical sense. Similarly, we have found nothing in the law requiring that the association elect apprentices by majority vote, although the fact that, as a practical matter, all pilots are association members makes this process sensible and efficient. What is clear, however, is that this process is long-standing and a matter of tradition for the pilots. See generally Kotch v. Board of River Port Pilot Com'rs for Port of New Orleans, 25 So.2d 527, 755-58 (1946), aff'd 330 U.S. 552 (1947).

7

Louisiana as non-profit corporations. LA. REV. STAT. § 12:201 et seq. Crescent's Charter provides that the objects and purposes of the corporation are, in relevant part:

> To provide efficient means for dispatching Crescent River Port Pilots to ships and vessels assigned and requiring the services of such pilots on an equitable basis, providing for the collection and disbursement of fees and charges of whatsoever nature and kind incident to the performance of such services, and making distribution thereof among the shareholders of this corporation after deducting all legitimate and approved expenses of the operation of same.
>
> To provide for a pension and welfare plan for retired shareholders of this corporation, and for their families.
>
> \*\*\*
>
> To inculcate, secure and maintain skill, discipline, merit and efficiency in the pilots engaged in piloting vessels over the pilotage waters assigned to the Crescent River Port Pilots, promoting and assisting the commerce and prosperity of the Port of New Orleans.

NOBRA's Charter similarly provides, albeit with much less specificity, that the purpose of the association is

> To carry on the business of piloting sea-going and other vessels on the Mississippi River, between the Mississippi River Ports of New Orleans and Baton Rouge and return, for fees, and to shift vessels in the harbors of Harahan, Avondale, St. Rose, Destrehan, Good Hope, Norco, Reserve, Burnside, Gramercy and other harbors to and including Baton Rouge, Louisiana, in accordance with Act 291 of the Legislature of 1942 of the State of Louisiana (Louisiana Revised Statutes 34:1041, et sequitur); and to inculcate, secure and maintain skill, discipline, merit and efficiency in the pilots engaged in this

8

> business, and to thereby promote and assist the commerce and prosperity of said ports and intermediate ports.

Each association is owned by its members; each member pilot holds one share of the association's stock.

The primary business of both associations is to receive requests for pilotage from ship agents and dispatch pilots to those vessels. The associations also collect the fees from the shipping companies for the pilotage work performed. The receipts, minus general overhead expenses, are remitted monthly to member pilots in accordance with an established formula based on the number of days each individual was available for piloting. The associations do not withhold tax or FICA on the monies distributed to pilot members, and pilots' pay is reflected on IRS Form 1099, rather than IRS Form W-2.

Membership in an association is not required by law, but most, if not all, pilots currently commissioned in the NOBRA and Crescent stretches of the river are members of the appropriate association.

II

A

Despite the complexity of the interrelationships and the working arrangements among the associations and the pilots, the facts underlying Coleman's claims are simple. Coleman, born on October 6, 1951, is an experienced ship captain who sought to become a commissioned pilot on the NOBRA and Crescent stretches of

9

the Mississippi River.

Coleman submitted an application for the apprenticeship program to the NOBRA Board in 1996. NOBRA held an election for apprentices in 2001, but Coleman's name did not appear on the ballot as a certified candidate for apprenticeship. At the time of the NOBRA election, Coleman was forty-nine years old. NOBRA requires that an applicant "not [have] reached his forty-fifth (45th) birth date."

Coleman also submitted an application for the apprenticeship program to the Crescent Board in 1999. Crescent held an election that same year, but Coleman's name did not appear on the ballot as a certified candidate for apprenticeship. At the time of the Crescent election, Coleman was forty-seven years old.[4] Crescent's Charter requires that an applicant "shall not have reached his fortieth birthday prior to the day of the first ballot for his election as an apprentice."

B

After filing an EEOC charge against NOBRA and receiving a right-to-sue letter, Coleman filed an action against NOBRA alleging

---

[4]Additional facts are alleged by Coleman and the defendants. These facts, however, are not relevant to the question whether these entities are "employers", but rather are relevant only to the establishment of a prima facie case of age discrimination and the subsequent McDonnell Douglas analysis. See generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Machinchick v. PB Power, Inc., 398 F.3d 345, 349-53 (5th Cir. 2005). The District Court did not address whether Coleman established a prima facie case of age discrimination.

10

that the association unlawfully discriminated against him on the basis of his age in violation of the ADEA by failing to elect him into the river pilot apprenticeship program. NOBRA moved for summary judgment asserting that it is not an "employer" under the ADEA. The District Court granted NOBRA summary judgment, finding that Coleman did not present a genuine issue of material fact with respect to whether NOBRA is an "employer" of river pilots within the meaning of the ADEA. <u>Coleman v. New Orleans Baton Rouge Steamship Pilots Association</u>, 2004 WL 1237447 (E.D. La. June 1, 2004). The District Court summarily adopted the reasoning of <u>Ehret v. State of Louisiana</u>, 862 F.Supp. 1546 (E.D. La. 1992), a case holding that Crescent lacked control over its member pilots and therefore was not their employer. <u>Ehret</u>, in turn, had found persuasive the analysis in the tort case <u>McKeithen v. The SS FROSTA</u>, 441 F.Supp. 1213 (E.D.La.1977), which held that NOBRA was not vicariously liable as an employer because it exerted no control over a pilot once he took the helm of a vessel. <u>McKeithen</u> likened NOBRA to other professional associations and found NOBRA pilots to be independent contractors.

Coleman also received right-to-sue letters from the EEOC for his charges against Crescent and the Crescent Board. Coleman then filed separate actions alleging violations of the ADEA against Crescent and the Crescent Board, which were consolidated before the District Court. Crescent and the Crescent Board both moved for summary judgment arguing in part that they are not "employers" or

11

"joint employers."  Relying on the same reasoning as the opinion in the NOBRA proceeding, the District Court granted Crescent and the Crescent Board summary judgment.  <u>Coleman v. Crescent River Port Pilot's Association, Inc.</u>, 2004 WL 1278005 (E.D. La. June 8, 2004).

Coleman now appeals both judgments.[5]  Thus, we have before us the two appeals presenting mutually dispositive issues.

### III

We review a grant of summary judgment <u>de</u> <u>novo</u>, using the same standard applied by the District Court.  <u>Hall v. Gillman, Inc.</u>, 81 F.3d 35, 36 (5th Cir. 1996).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

### A

### (1)

A primary purpose of the ADEA is to prohibit arbitrary age discrimination in employment.  29 U.S.C. § 621(b).  To accomplish this purpose, the ADEA prohibits certain practices by employers,

---

[5]Coleman also appeals the District Court's denial of his motions for reconsideration of the summary judgment motions, or in the alternative new trial.  We do not discuss these issues on appeal because Coleman's argument is underdeveloped, simply arguing that his motions should have been granted to correct the manifest injustice of the District Court's error in granting summary judgment to defendants.

employment agencies, and labor organizations.  29 U.S.C. § 623(a)-(c).  In relevant part, the ADEA makes it unlawful for an employer

> to otherwise fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.

29 U.S.C. § 623(a)(1).  An employment agency may not

> fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age.

29 U.S.C. § 623(b).  Finally, it is unlawful for a labor organization

> (1) to exclude or expel from its membership, or otherwise to discriminate against, any individual because of his age;

> (2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's age;

> (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

29 U.S.C. § 623(c).  Although the prohibitions of the ADEA are broad in scope, the reach of the ADEA is limited by the statute's own definitions of "employer," "employment agency," and "labor organization."  See 29 U.S.C. § 630.  If an entity is not an

13

employer, employment agency, or labor organization, it is not subject to the prohibitions of the ADEA against age discrimination in employment.

The question that confronts us is whether Crescent[6] and NOBRA are entities that are subject to the prohibitions of the ADEA. The answer to this question is not immediately apparent. We begin by considering each possibility of coverage under the ADEA.

(2)

We first observe that NOBRA and Crescent cannot be considered "employment agencies" or "labor organizations" under the ADEA. Coleman has not made such an assertion, but at first glance, NOBRA and Crescent share characteristics with employment agencies and labor organizations as they are commonly understood. The dispatching function of the associations, matching pilots with vessels needing piloting, may be analogized in a general way to the usual purpose of an employment agency or union hiring hall. However, we must deal specifically with the definitions in the ADEA. NOBRA and Crescent are not labor organizations because they do not exist for the "purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment . . . ." 29 U.S.C. § 630(d). Although the ADEA refers to hiring halls, its

---

[6]Coleman does not assert that the Crescent Board is an employer standing alone, but rather that the Crescent Board is only subject to the ADEA as a joint employer with Crescent.

14

reference is only to explain that a labor organization is "deemed to be in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer . . . ."  29 U.S.C. § 630(e).

Moreover, labor organizations interact with the <u>employer</u> of the members of the organization.  A shipowner or charterer is not the hired pilot's employer in the sense relevant here, for it exercises no control over the pilot's navigation of the vessel.  We can find no argument or authority for deeming pilots anything other than independent contractors of the vessels they are hired to navigate.  Thus, this term "employer" prevents our finding that NOBRA and Crescent are employment agencies, which are defined as "any person regularly undertaking with or without compensation to procure employees for an <u>employer</u> and includes an agent of such person . . . ."  29 U.S.C. § 630(c) (emphasis added).

Despite the functional similarities between the associations and labor organizations/employment agencies, because of the ADEA definitions of the two types of entities, we are left to consider only whether NOBRA and Crescent are <u>employers</u> of their member pilots.  The ADEA defines an "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . ."  29 U.S.C. § 630(b). This definition, however, provides little guidance in determining

15

whether a particular entity is in fact an employer; the statute simply defines "employee" as "an individual employed by any employer . . . ." 29 U.S.C. § 630(f).[7]

The circular language defining "employer" at least states clearly that an entity must employ twenty or more employees to satisfy the ADEA definition of employer. Whether Crescent or NOBRA has more than twenty employees depends entirely on whether the pilots are considered to be employees of the associations. We are thus left with the sole question whether the pilots are the associations' employees, a term not substantively defined by the statute.[8]

_____

[7]The terms "employer" and "employee" have been identically treated under the ADEA and Title VII. Thus, cases interpreting the terms under either statute may be considered in determining whether the defendants are employers for the purposes of the ADEA. See Fields v. Hallsville Indep. School Dist., 906 F.2d 1017, 1020 n.7 (5th Cir. 1990), cert. denied, 498 U.S. 1026 (1991).

[8]As noted above, the District Court relied on Ehret's multi-factor right-to-control analysis to hold that the pilots are not employees of the associations. Coleman asserts that Ehret is no longer controlling law because the post-Ehret promulgation of 29 C.F.R. § 1625.21 clarified that NOBRA and Crescent are employers at least with respect to the apprenticeship program. Coleman notes that the EEOC specifically referred to 29 C.F.R. § 1625.21 in finding that cause existed to believe that Coleman was discriminated against because of his age. Coleman also notes that courts have allowed plaintiffs to proceed against operators of similar apprenticeship programs for violations of the ADEA. See EEOC v. Joint Apprenticeship Committee, 186 F.3d 110 (2d Cir. 1999).

We think Coleman misreads the scope of 29 C.F.R. § 1625.21. We agree with the District Court that the regulation "expands the coverage of the ADEA to applicants for apprenticeship programs, but does not expand the classes of persons liable pursuant to the ADEA as set forth in 29 U.S.C. § 623." Coleman v. New Orleans Baton

16

We have come all this way to arrive at the point suggested by the previous cases and indeed by the District Court: the touchstone of our analysis centers around the common-law notion of control of the individual. Our approach to the question of control takes a somewhat different path, however. In Clackamas Gastroenterology Associates, P.C. v. Wells, 538 U.S. 440 (2003), the Supreme Court approved the EEOC's gloss on the control standard in questioning whether a partner, officer, major shareholder, or director qualifies as an employee. Given the relationship between the pilots and the associations, which we have earlier described in detail, we find such an analysis specifically appropriate. The EEOC framed the issue as "whether the individual acts independently and participates in managing the organization, or whether the individual is subject to the organization's control." Id. at 448 (internal citation omitted). The Court specifically embraced the EEOC's proposed six factors relevant to determining whether a shareholder/director is an employee of the organization:

---

Rouge Steamship Pilots Ass'n, 2004 WL 1237447, at *3 (E.D. La. June 1, 2004). Section 1625.21 did not alter 29 C.F.R. § 1625.1, which provides that "the terms person, employer, employment agency, labor organization, and employee shall have the meanings set forth in § 11 of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 621 et. seq. . . . ." The regulation itself makes clear that it does not expand liability beyond "employers" by specifically referencing the "prohibitions of Section IV of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623." The Second Circuit's decision in Joint Apprenticeship Committee is not to the contrary because it simply assumed that an employer-employee relationship existed. 186 F.3d at 115.

(1) Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work

(2) Whether, and if so, to what extent the organization supervises the individual's work

(3) Whether the individual reports to someone higher in the organization

(4) Whether, and if so, to what extent the individual is able to influence the organization

(5) Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts

(6) Whether the individual shares in the profits, losses, and liabilities of the organization.

Id. at 449-50. We now apply these Supreme Court/EEOC factors to the pilots' relationship to the defendant associations.

The first factor we consider is whether the pilots' associations hire and fire the member pilots. Despite Coleman's arguments to the contrary, they do not. Certainly, the pilots' associations do have the power to elect apprentices and to admit pilots into their membership. The associations, however, do not have the power to grant commissions that permit the pilot to work in the profession; pilots receive their commissions from the Governor, and the associations cannot decommission a pilot. With respect to the actual job performed -- piloting -- the role of the associations is essentially that of dispatching pilots to the ships needing them; the vessel engages the pilot and the master of the

18

vessel can refuse the services of a particular pilot. This first factor weighs against labeling the pilots ADEA employees.

The second and third factors ask whether the pilots' associations supervise the individual pilot's work and whether the pilot reports to someone "higher" in the association. As noted earlier, the primary business of the associations is to receive requests for pilotage, dispatch pilots to the vessels, and collect and disburse pilotage fees. The associations do not supervise the pilots in their work, nor is there a chain of command in the performance of their work -- the individual pilot gives navigation advice independently according to his own professional judgment. These two factors therefore weigh against labeling the pilots ADEA employees.

The fourth factor asks to what extent the pilots are able to influence the pilots' associations. Pilots constitute the entire body of shareholders of their respective associations. Each pilot holds an equal share and participates in the election of directors of the association and in shareholder-approval votes. Thus, the pilots exert substantial influence over the general management of the association as well as the promulgation of association rules and regulations specifically. This factor, too, weighs against labeling the pilots ADEA employees.

The fifth factor asks whether the parties intended that the individual pilot be an employee. Clearly not. Each of the charters of NOBRA and Crescent makes unequivocal that no employment

19

relationship is intended; these charters expressly define the relationship between the pilots and the association as an association for the mutual benefit of the member pilots. This factor also weighs against labeling the pilots ADEA employees.

The sixth factor asks whether the pilots share in the profits, losses, and liabilities of the association. Pilots share in the "profits" of the association (and the "losses" if times are not good) by receiving a share of collected fees according to a set formula agreed upon by the shareholder pilots themselves. At the same time, the associations have no respondeat superior liability for the conduct of the pilots, which emphasizes the lack of control over the work of the pilot. Consistent with the fact that pilots act independently according to their own professional judgment in piloting a vessel, pilots remain personally liable for their own negligence. See McKeithen, supra. Further, the associations' charters specifically state that the associations are not responsible for debts or faults of their members. This factor also weighs against labeling the pilots ADEA employees.

We conclude that the EEOC's six factors, though not necessarily exhaustive, are decisive here. Each factor weighs against finding that the pilot is an employee of the association. The associations obviously are the most important and determinative factor in the work life of a pilot; yet the elements of employer control over an employee fail to describe the character of the power that the associations exercise. It is certainly true that

20

the associations, along with the NOBRA and Crescent Boards and the governor, play an almost monopolistic gate-keeper role in determining who will ultimately work as a river pilot; it is also true that the associations (through their members) set rules and regulations directly affecting the daily work of each pilot. Nevertheless, if <u>Clackamas</u> is our guide, the central characteristics of employer control over the pilot are lacking. The associations do not hire or fire pilots, nor can they decommission them; they do not supervise the pilots in their work; and their charters create relationships that cannot be characterized as employee/employer. The pilots do their work independently according to their own professional judgment; they have ultimate control over the associations' rules and regulations that bind them; and they retain personal liability for their own negligence, with no vicarious liability attaching to the associations. Until the United States Supreme Court adopts a wholly different analytical approach from the one provided by <u>Clackamas</u>, we think it clear that the pilots are not employees of the associations. It follows that neither of the associations, with fewer than twenty employees, is an employer within the definition of the ADEA.

Accordingly, we hold that the District Court did not err in granting NOBRA and Crescent summary judgment.

B

Coleman does not assert that the Crescent Board itself is an

21

"employer."  See Camacho v. Puerto Rico Ports Authority, 369 F.3d 570 (1st Cir. 2004).  Instead, Coleman argues that the Crescent Board is a joint employer with Crescent.  Because we hold that Crescent is not an employer of pilots under the ADEA, it follows that the Crescent Board cannot be a joint employer with Crescent. Accordingly, we hold that the District Court did not err in granting summary judgment to the Crescent Board because it is not an employer under the meaning of the ADEA.

IV

Based on the foregoing considerations, which are, of necessity, narrowly bound to the unique qualities of the pilots' associations presented here, the District Court's grants of summary judgment are

AFFIRMED.